Delores GONSALVES, as Administratrix
of the Estate of Morris Pina, Jr.,
Plaintiff,

v.

CITY OF NEW BEDFORD, Leonard Baillargeon, Richard Benoit, Frederick Borges, John Bullard, Robert Devlin, Sandra Grace, John Hoffman, Patrick Lawrence, Stephen Olivera, and Michael Pacheco, Defendants.

Civil Action No. 91–11993–MLW.

United States District Court,
D. Massachusetts.

Aug. 2, 1996.

See also 939 F.Supp. 915.

Howard Friedman, Law Offices of Howard Friedman, Boston, MA, Harvey A. Schwartz, Robert A. Griffith, Schwartz, Shaw & Griffith, Boston, MA, for Delores Gonsalves.

Patrick T. Walsh, New Bedford, MA, for City of New Bedford.

Gerald S. McAuliffe, McParland & McAuliffe, Quincy, MA, for Leonard Baillargeon, Stephen Oliveira.

Gerald S. McAuliffe, McParland & McAuliffe, Quincy, MA, Joseph P. McParland, Dedham, MA, for Frederick Borges, and Sandra Grace.

Edward P. Reardon, Reardon & Reardon, Worcester, MA, for Robert Devlin, John D. Hoffman.

Sheila M. Tierney, New Bedford, MA, for Patrick Lawrence.

Armand Fernandes, Jr., City Solicitor, New Bedford, MA, John F. Folan, McLaughlin & Folan, New Bedford, MA, for Michael Pacheco.

Patrick T. Walsh, New Bedford, MA, Armand Fernandes, Jr., Fernandes, Fraze & Finnerty, New Bedford, MA, for Richard Benoit, John K. Bullard.

### *MEMORANDUM AND ORDER*

WOLF, District Judge.

Attached is a memorandum based upon the transcript of the decision rendered orally on June 28, 1996, imposing sanctions on plaintiff's counsel, Robert Griffith, Esq. for his failure to disclose certain material facts during the course of this litigation. This memorandum adds citations, deletes some colloquy, and clarifies some language.

### I. Introduction

This is a sad chapter in a sad case. In this case, the jury found that on June 16, 1990, Morris Pina, Jr. was beaten in his cell by employees of the New Bedford Police Department, denied care for his serious medical needs and, as a result, died. The jury was, however, unable to determine who was responsible for these violations of Morris Pina, Jr.'s constitutional rights because, it found, nine of the individual defendants employed

by the New Bedford Police Department had engaged in a cover-up of what had occurred.[1]

In the first phase of the bifurcated trial ("Phase One"), the jury awarded $435,000 to Pina's estate. In the second phase of the trial ("Phase Two"), the jury found that the City of New Bedford (the "City") was liable for that judgment because of the deliberate indifference of its policymakers, the Mayor of New Bedford and the New Bedford City Council, to the way complaints by civilians of police misconduct were customarily handled.

As lead counsel for the prevailing party, Robert Griffith, Esq. filed a petition for attorney's fees of over $800,000. The defendants also filed motions to vacate the judgments against them. Following Phase One, I denied such motions with regard to the employees of the New Bedford Police Department, except for the Chief of Police, who was also a defendant in Phase Two. The decision as to the Chief was reserved until the conclusion of Phase Two.

After I indicated at the hearings on the post-trial motions that I might vacate the judgments against the City and the Mayor in his individual capacity because of insufficiencies in the evidence, and after encouragement by the court, the parties agreed on a settlement. The settlement provided that: (1) the judgments against the City and the Mayor in his individual capacity would be vacated; (2) the City would pay $555,000 to plaintiff and her counsel; (3) the parties would exchange releases; and (4) the case would be concluded, with the exception of one vexing issue—the question of sanctions to be imposed on Robert Griffith, Esq. for certain aspects of his conduct in the case and the question of possible sanctions against his client, the plaintiff, Delores Gonsalves.

As the issue involved the integrity of the administration of justice, and not merely the private interests of the parties, I informed the parties that the issue of sanctions could not, and would not, be resolved as part of their settlement. As I recognized, however, in determining the amount of any sanctions,

proportionality is a relevant consideration.[2] Thus, I stated that the fact that Mr. Griffith and his colleagues would be receiving $231,700 in attorneys' fees from the settlement, rather than the higher amount they would have been awarded even if the verdicts finding municipal liability had been vacated, would have the effect of reducing the amount of the sanction to be imposed.

In implementing the settlement and vacating the verdicts against the City and its Mayor, I commended plaintiff's counsel, particularly Mr. Griffith, for their efforts. As I then said, it took considerable conviction, compassion, and courage for Mr. Griffith to take this case. It also took determination to continue it when confronted with many obstacles in trial preparation.

The trial, which took over four months, was arduous. Mr. Griffith and his colleagues, however, persevered and prevailed in establishing at least the liability of the individual defendants employed by the New Bedford Police Department. This was an important achievement, not only for the estate of Morris Pina, Jr., but also, the court expects, for other citizens of New Bedford.

Unfortunately, during the course of the trial, it was revealed that Morris Pina, Jr. was HIV positive at the time of his death. Mr. Griffith was aware of this fact before he brought suit. Yet he engaged in a pattern of activity to hide this fact (which was relevant to the issue of damages that might be recovered and possibly relevant to the amount of attorneys' fees he might be awarded) both from the defendants and initially, when the issue arose after two months of trial, from the court.

As I will describe in detail, this strategy included deliberate violations of Mr. Griffith's duties in discovery as established by the Federal Rules of Civil Procedure. The strategy also included misleading statements to the jury and misleading statements to the court, the latter of which Mr. Griffith, to his credit, corrected when he was confronted

---

1. The City of New Bedford and Mayor John Bullard were not implicated by the jury's finding of a cover-up in Phase One of the bifurcated trial in this case.

2. See *Navarro–Ayala v. Nunez,* 968 F.2d 1421, 1426 (1st Cir.1992).

with direct questions and contradictory evidence concerning them.

Having considered the nature of the proven misconduct and the relevant standards, I have decided to impose sanctions on Mr. Griffith in the amount of $15,000 for violation of his discovery obligations. I also intend to publish this decision. For reasons which I will explain, however, I do not intend to exercise my authority to refer this matter to the Board of Bar Overseers for further proceedings, although I recognize that the Board of Bar Overseers has the power to initiate such proceedings itself. In essence, as I said previously in connection with the settlement, I believe that there is value to finality concerning this case, and this matter, although it is foreseeable that the controversy which it has generated will endure, as it should if these painful events are to have instructive, and perhaps some redeeming, value.

## II. Findings of Fact and Conclusions of Law

### A. Pre–May 1992 Developments

Morris Pina, Jr. died in June 1990. By 1991, his family had retained Robert Griffith, Esq. of Schwartz, Shaw & Griffith to represent Mr. Pina's estate. At that time, Morris Pina, Jr.'s mother, Mary Pina, and his sister, Delores Gonsalves, knew that Dr. H. Ram Chowdri had provided medical services to Morris Pina, Jr. because they had previously received from Dr. Chowdri inquiries regarding an unpaid bill. Dr. Chowdri was an infectious disease specialist at St. Luke's Hospital ("St. Luke's") in New Bedford. He saw and advised Morris Pina, Jr. on May 24, 1988 after Mr. Pina had tested HIV positive.

On June 17, 1991, Mr. Griffith's firm wrote to Dr. Chowdri requesting copies of all medical records of Morris Pina, Jr.[3] They sent a release signed by Mary Pina.[4] Dr. Chowdri's records were sent to Mr. Griffith on July 2, 1991.[5] The records included a consultation note revealing that Morris Pina, Jr. had tested positive for HIV at St. Luke's Hospital in May 1988.[6]

At that time, Mr. Griffith was planning to file suit against the City of New Bedford and a number of its officials and employees. Although he had written to many organizations seeking relevant materials and knew (at least from the time that he received Dr. Chowdri's records) that Morris Pina, Jr. had been treated at St. Luke's, Mr. Griffith decided not to obtain the St. Luke's records because he knew that if he obtained them, he would have to disclose them to the defendants in discovery. Although he was in close touch with Delores Gonsalves, who was appointed administratrix of Morris Pina, Jr.'s estate in July 1991, Mr. Griffith did not inform her that her brother had been HIV positive.

Mr. Griffith filed suit on July 29, 1991. Many of the defendants did not immediately respond to the complaint. The plaintiff filed motions for default and also commenced discovery. By December 1991, the defendants too were serving interrogatories. As I will describe, Mr. Griffith worked closely with Delores Gonsalves in preparing responses to those interrogatories. The questions asked, if accurately and completely answered, would have revealed to the defendants that Morris Pina, Jr. was treated at St. Luke's Hospital by Dr. Chowdri (who is well known in New Bedford as its "AIDS doctor") and that Mr. Pina was HIV positive at the time of his death. Delores Gonsalves, however, deliberately did not reveal in her answers to the interrogatories that she knew that Morris Pina, Jr. had been treated by Dr. Chowdri at St. Luke's.

Mr. Griffith knew that these answers were false. He did not sign the answers to the interrogatories as required by Fed.R.Civ.P. 26(g)(2), although, with regard to most of them, he signed the responses as to objections. In addition, Mr. Griffith did not include in the responses to the interrogatories the fact that Morris Pina, Jr. was HIV positive, although, as I will explain, he had a legal duty to do so.

---

3. Trial Exhibit 60.

4. *Id.*

5. Trial Exhibit 61.

6. Trial Exhibit 62.

Mr. Griffith acknowledged in his written and oral statements of February 1996,[7] and reiterated in the May 1996 memorandum concerning sanctions filed on his behalf,[8] that he should have caused Dr. Chowdri and Morris Pina Jr.'s HIV status to be disclosed to the defendants in responding to the interrogatories. There was no legitimate excuse for his failure to do so.

In any event, without regard to these concessions, or any qualification of them which might be inferred from Mr. Griffith's counsel's argument on June 24, 1996,[9] I find that the repeated and related false answers to interrogatories resulted from a deliberate decision by Mr. Griffith to try to conceal from the defendants the fact that Morris Pina, Jr. was HIV positive. This fact was clearly relevant to the length and quality of life that Morris Pina, Jr. lost when he died in the New Bedford jail and, therefore, important to the calculation of damages Mr. Griffith was seeking for his client.[10] Mr. Griffith had decided, however, to conceal this adverse information from the defendants.

More specifically, on January 2, 1992, Delores Gonsalves answered interrogatories propounded by defendant Patrick Lawrence.[11] Mr. Griffith assisted in preparing responses to these interrogatories. Question 8(a) asked: "What was the general condition of the decedent's health immediately before the alleged incident out of which this action arose?"[12] Question 8(b) asked: "Was the decedent suffering from any disease, disability or injury prior to the alleged incident? If the answer is in the affirmative, please furnish the exact nature of this disease, disability or injury."[13]

Delores Gonsalves answered that she did "not know the general condition of [Morris Pina, Jr.'s] health immediately prior to the alleged incident."[14] Mr. Griffith, however, knew that Morris Pina, Jr. was HIV positive, yet he caused Delores Gonsalves to sign the responses under the pains and penalties of perjury and also signed them himself, purporting to limit his signature to the objections.[15]

By December 1991, the plaintiff had also received interrogatories from defendant John Hoffman. Mr. Griffith assisted Delores Gonsalves in answering these interrogatories too.[16] His time records reflect that he spent considerable time in December 1991 working on the responses.[17] Delores Gonsalves drafted some responses. On January 6, 7 and 8, 1992, Mr. Griffith, according to his time rec-

---

**7.** *See* Plaintiff's Supplemental Memorandum in Opposition to Defendants' Motions For Sanctions, February 15, 1996, p. 4; Transcript, February 14, 1996, pp. 120–21.

**8.** *See* Response to Defendants' Motion For Sanctions, May 16, 1996, p. 5.

**9.** At the hearing held on June 24, 1996, counsel for Mr. Griffith, Janis Berry, Esq., questioned whether Mr. Griffith's knowledge of Morris Pina, Jr.'s HIV status could be imputed to Ms. Gonsalves for the purposes of her answers to interrogatories. Her contention seemed to conflict with her earlier written submission which stated that "Morris Pina's HIV status should have been disclosed to the Defendants." Response to Defendants' Motion For Sanctions, May 16, 1996, p. 5. After I outlined the authority indicating that Mr. Griffith's conduct was improper and sanctionable, Ms. Berry was invited to submit, either orally or in writing, contrary authority. No citations to contrary authority were submitted.

**10.** On December 6, 1996, the court held that the plaintiff was entitled to recover "hedonic damages" if the jury found that one or more of the defendants had violated Morris Pina, Jr.'s constitutional rights and, as a result, had caused his death. Hedonic damages are designed to com-

pensate a decedent for the loss of the pleasure and enjoyment which the decedent would have experienced in his life, had he lived. *See Bell v. City of Milwaukee*, 746 F.2d 1205, 1234 (7th Cir.1984); *Sherrod v. Berry*, 629 F.Supp. 159, 163–64 (N.D.Ill.1985). In the present case, the jury awarded $400,000 in hedonic damages.

**11.** Exhibit 2 to June 24, 1996 Hearing, Plaintiff Delores Gonsalves' Answers to Interrogatories Propounded by Patrick Lawrence, January 2, 1992.

**12.** *Id.* at 4.

**13.** *Id.*

**14.** *Id.*

**15.** *Id.* at 17.

**16.** Plaintiff Delores Gonsalves Answers to the Interrogatories of the Defendant John Hoffman, Question 2, p. 1.

**17.** Application For Attorney's Fees Pursuant to 42 U.S.C. § 1988, Exhibit K, pp. 24–29.

ords, revised and edited her responses in consultation with her.[18] During this same period, Mr. Griffith was also working on motions to compel the production of documents by the defendants, the first of which was filed on January 7, 1992.[19]

Mr. Hoffman's interrogatories asked, among other things, for the plaintiff to identify (1) any hospital to which Morris Pina, Jr. had been admitted and the dates of his admittance,[20] and (2) the names and addresses of all persons or institutions having custody and control of any of Morris Pina, Jr.'s medical records.[21]

The plaintiff's answers to those interrogatories stated that she had "no knowledge as to whether or not [Morris Pina, Jr.] was admitted to any hospital or institution for examination or treatment before this alleged incident." [22] They also indicated by reference to that response that Delores Gonsalves had no knowledge of any person or institution which had any of Morris Pina, Jr.'s medical records.[23]

Thus, after consulting Mr. Griffith, Delores Gonsalves gave answers to these questions that she knew, or should have recognized, were false. Mr. Griffith also knew that these answers were false. At the time of the answers, Mr. Griffith had Dr. Chowdri's consultation note indicating Morris Pina, Jr.'s admittance to St. Luke's on or about May 24, 1988 and Morris Pina, Jr.'s HIV positive status.

Mr. Griffith also knew that if Delores Gonsalves identified St. Luke's and/or Dr. Chowdri in responding to the interrogatories, the defendants would seek the relevant records and ask questions which would likely lead to the eventual discovery by the defendants of Morris Pina, Jr.'s HIV status. Yet, Mr. Griffith caused Delores Gonsalves to sign these answers to Mr. Hoffman's interrogatories under the pains and penalties of perjury, subjecting her to the possibility of a criminal investigation, prosecution, and conviction. He also signed the responses himself, purporting to limit his signature to the objections.

On behalf of Delores Gonsalves, Mr. Griffith filed supplemental answers to Mr. Hoffman's interrogatories on March 16, 1992, May 17, 1993, October 12, 1993, and in December 1993.[24] These responses, among other things, revealed that Morris Pina, Jr. had been treated at the Bridgewater Treatment Center and Harmony House.[25] These responses again, however, did not disclose Morris Pina, Jr.'s admittance to St. Luke's or identify St. Luke's or Dr. Chowdri as having medical records pertaining to him. According to his time records, Mr. Griffith drafted these responses.[26] Once again, Delores Gonsalves and Mr. Griffith signed the answers. Mr. Griffith purported to limit his signature only to the objections. Once again, Mr. Griffith knew that the responses were false and incomplete because they failed to identify St. Luke's and Dr. Chowdri. I find that Delores Gonsalves was relying on the advice and guidance of Mr. Griffith in filing answers which she knew or should have recognized were false.

On or about February 2, 1992, Delores Gonsalves responded to interrogatories pro-

---

18. *Id.* at 29–30.

19. *Id.* at 29.

20. Plaintiff Delores Gonsalves Answers to the Interrogatories of the Defendant John Hoffman, Question 4, p. 2.

21. *Id.*, Question 5, p. 3.

22. *Id.* at 4–5.

23. *Id.*

24. Plaintiff Delores Gonsalves' First Supplementary Answers to the Interrogatories of the Defendant John Hoffman; Plaintiff Delores Gonsalves' Second Supplemental Answers to the Interrogatories of the Defendant John Hoffman; Plaintiff Delores Gonsalves' Third Supplemental Answers to the Interrogatories of the Defendant John Hoffman; Plaintiff Delores Gonsalves' Fourth Supplemental Answers to the Interrogatories of the Defendant John Hoffman.

25. Plaintiff Delores Gonsalves' First Supplementary Answers to the Interrogatories of the Defendant John Hoffman, pp. 1–2.

26. Application For Attorneys Fees Pursuant to 42 U.S.C. § 1988, Exhibit K, p. 42.

pounded by defendant Michael Pacheco.[27] According to his records, Mr. Griffith drafted the answers.[28] Question 18 of those interrogatories asked the plaintiff to describe all of Morris Pina, Jr.'s "physical abnormalities." [29] Delores Gonsalves responded that "to the best of [her] knowledge [Morris Pina, Jr.] did not have any physical abnormalities at the time of the alleged incident." [30] She signed the answers. In violation of his duties under Fed.R.Civ.P. 26(g)(2), Mr. Griffith did not sign the responses.

■ I find that Mr. Griffith and Ms. Gonsalves violated their respective legal obligations in responding to the defendant's interrogatories. Ms. Gonsalves knew that Morris Pina, Jr. had been admitted to St. Luke's and that he had been treated by Dr. Chowdri. She did not disclose this information in her answers to interrogatories. At times when she testified about this nondisclosure, she claimed that it was inadvertent.[31] At other times, she stated that she deliberately failed to disclose that Morris Pina, Jr. had been treated at St. Luke's.[32] I find that she knew at the time of the responses to Mr. Hoffman's interrogatories that Morris Pina, Jr. had been admitted to St. Luke's and that he had been treated by Dr. Chowdri, but that she relied on the guidance and drafting of Mr. Griffith in not disclosing these facts.

Delores Gonsalves asserted that she did not know that Morris Pina, Jr. was HIV positive until Mr. Griffith sent her to pick up her brother's records at St. Luke's Hospital on February 13, 1996. I believe this testimony. Nevertheless, as I will explain, she and Mr. Griffith had an obligation to disclose Morris Pina, Jr.'s HIV status in answering Mr. Lawrence's interrogatories asking whether Morris Pina, Jr. had any disease.

■ In 1947, the Supreme Court wrote in *Hickman v. Taylor* that: "A party clearly cannot refuse to answer interrogatories on the ground that the information sought is solely within the knowledge of her attorney." [33] In their treatise, Professors Wright and Miller discuss this longstanding principle: "A party is charged with knowledge of what its agents know, or what is in records available to it ... A party must disclose facts in its attorney's possession even though the facts have not been transmitted to the party." [34] Similarly, Professor Moore writes in his treatise that "in *Hickman v. Taylor*, the Supreme Court said flatly that '[a] party cannot refuse to answer interrogatories on the ground that the information sought is solely within the knowledge of his attorney.' This language has been followed in later cases. An individual is in no better position than a corporation to claim lack of knowledge, if the information can be secured, whether from his attorney or otherwise." [35] Thus, it is truly hornbook law, readily accessible to Mr. Griffith and other attorneys in 1992, that Delores Gonsalves had a duty to disclose Morris Pina, Jr.'s HIV positive status when she answered Mr. Lawrence's interrogatories in January 1992.

Reported cases going back to at least 1947 have reiterated and elaborated the holding in *Hickman.* For example, in 1947, the court in *State of Maryland v. Baltimore & O.R. Co.* wrote: "The plaintiff, having authorized her attorney to bring this suit, to appear for her and to prepare for and conduct this litigation, was bound to disclose facts relating to the accident in his possession even though at the time she answered the interrogatories ·the information may not have been transmit-

27. Plaintiff Delores Gonsalves Answers to the Defendant Michael Pacheco's Interrogatories Propounded to the Plaintiff.

28. Application For Attorneys Fees Pursuant to 42 U.S.C. § 1988, pp. 35–36.

29. Plaintiff Delores Gonsalves Answers to the Defendant Michael Pacheco's Interrogatories Propounded to the Plaintiff, Question 18, p. 8.

30. *Id.* at 8.

31. Transcript, February 27, 1996, pp. 92–93, 97.

32. Transcript, February 15, 1996, pp. 70–71.

33. *Hickman v. Taylor,* 329 U.S. 495, 504, 67 S.Ct. 385, 390, 91 L.Ed. 451 (1947).

34. 8A Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2177 (1994), pp. 318–19.

35. 4A James Wm. Moore *Moore's Federal Practice* § 33.26 (1995), p. 33–133.

ted to her." [36] This principle has, since 1947, been frequently reaffirmed.[37]

As described earlier, Mr. Griffith drafted some of Delores Gonsalves' answers to interrogatories. He assisted in the preparation of all of them. He deliberately caused her to submit answers that were false and misleading in material respects. Thus, Mr. Griffith caused Ms. Gonsalves to violate the duty of disclosure established by *Hickman v. Taylor* and its progeny.

[redacted] Mr. Griffith's conduct also violated his duty under Fed.R.Civ.P. 26(g)(2), which requires that every discovery response be signed by an attorney of record for the party furnishing the response.[38] This provision was adopted in 1983, well before the inception of this case. The Advisory Committee Notes to Rule 26(g) are relevant to this matter. They state, in part:

> Rule 26(g) imposes an affirmative duty to engage in pre-trial discovery in a responsible manner that is consistent with the spirit and purposes of Rules 26 to 37. In addition, Rule 26(g) is designed to curb discovery abuse by explicitly encouraging the imposition of sanctions. The subdivision provides a deterrent to ... evasion by imposing a certification requirement that obliges each attorney to stop and think about the legitimacy of a discovery request, a response thereto, or an objection.... Rule 26(g) does not require the signing attorney to certify the truthfulness of the client's factual responses to a discovery request. Rather, the signature certifies that the lawyer has made a reasonable effort to assure that the client has provided all of the information and documents *available to him* that are responsive to the discovery demand.[39]

As described earlier, Mr. Griffith signed the objections to the Hoffman and Lawrence interrogatories, but he did not state that he was signing Delores Gonsalves' responses. I find, however, that he had a duty to ensure that Delores Gonsalves was provided all information "available to [her]" that was responsive to the discovery requests. I also hold that an attorney cannot evade that duty by claiming to sign the objections only, or by not signing the responses at all. Mr. Griffith deliberately failed to satisfy that duty by repeatedly submitting Delores Gonsalves' answers to interrogatories which did not disclose that Morris Pina, Jr. was treated at St. Luke's by Dr. Chowdri or that he was HIV positive.

## B. Developments During and After May 1992

Although the plaintiff had not identified St. Luke's as a hospital at which Morris Pina, Jr. had been treated, it is the only hospital in New Bedford. Thus, in May 1992, John Folan, Esq., counsel for defendant Michael Pacheco, issued a deposition subpoena for any records St. Luke's might have concerning Morris Pina, Jr. On or about May 27, 1992, Mr. Folan received records from St. Luke's concerning Mr. Pina.[40] Thus, he canceled the scheduled deposition.

**36.** *State of Maryland v. Baltimore and O.R. Co.*, 7 F.R.D. 666, 667 (E.D.Pa.1947).

**37.** *See, e.g., Wycoff v. Nichols*, 32 F.R.D. 370, 372 (W.D.Mo.1963); *Steelman v. U.S. Fidelity & Guaranty Company*, 35 F.R.D. 120, 121 (W.D.Mo. 1964); *Roberson v. Ryder Truck Lines*, 41 F.R.D. 166, 167 (N.D.Miss.1966); *Pilling v. General Motors*, 45 F.R.D. 366, 369 (D.Utah 1968); *Miller v. Doctor's General Hospital*, 76 F.R.D. 136, 140 (W.D.Okl.1977); *In re Shopping Carts Antitrust Litigation*, 95 F.R.D. 299, 306 (S.D.N.Y.1982).

**38.** Fed.R.Civ.P. 26(g)(2) states, in pertinent part, that:

> Every discovery request, response or objection made by a party represented by an attorney shall be signed by at least one attorney of record in the attorney's individual name, whose address shall be stated.... The signature of the attorney ... constitutes a certification that to the best of the signer's knowledge, information, and belief, formed after a reasonable inquiry, the request, response, or objection is: (A) consistent with these rules and warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law; (B) not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation; and (C) not unreasonable or unduly burdensome or expensive....

**39.** Fed.R.Civ.P. 26(g)(2) Advisory Committee's Note (1983) (emphasis added).

**40.** Trial Exhibit K for Identification.

The package Mr. Folan received included a cover letter which had a footnote stating: "Portions of this medical record which are further protected have been knowingly redacted."[41] Mr. Folan did not notice, or understand, the possible implications of this statement. Mr. Folan sent copies of the St. Luke's records to all counsel in the case, including Mr. Griffith. Mr. Griffith claims that he did not receive the cover letter from St. Luke's which stated that portions of the records had been redacted. It was not part of the St. Luke's materials which he furnished to the court with his motion in limine dated February 12, 1996.[42] The court has not been informed whether other counsel received the St. Luke's cover letter along with the documents sent by Mr. Folan.

In any event, Mr. Griffith looked at the records and saw that those pertaining to Morris Pina, Jr.'s May 1988 admittance to St. Luke's were not included. He knew that these records contained references to the fact that Mr. Pina had been tested and found to be HIV positive. As a former Assistant Attorney General who had prosecuted Medicare fraud, and as an expert in civil health law litigation, Mr. Griffith also knew that in Massachusetts a hospital is not permitted to "disclose the results of [an HIV] test to any person" or to "identify the subject of [an HIV] test[ ] to any person without first obtaining the subject's written informed consent."[43] Thus, even without receipt of the St. Luke's cover letter from Mr. Folan, Mr. Griffith had a basis to infer that the records relating to Mr. Pina's May 1988 admittance to St. Luke's had been withheld by the hospital.

Mr. Griffith says that he promptly called St. Luke's and was told by an unidentified person that "all" of the St. Luke's records had been sent to Mr. Folan.[44] At this time, May 1992, Mr. Griffith felt that the defendants were refusing to provide documents to which he was entitled. He had already prevailed on two motions to compel production of documents.

Mr. Griffith also says that after calling St. Luke's, he believed that the defendants were in possession of the May 1988 records which revealed that Morris Pina, Jr. was HIV positive, but that they were improperly hiding the records and information from him in an effort to surprise him with the undisclosed material when they presented the defendants' case at trial.[45] The court is skeptical as to this purported belief, but makes no finding as to its truthfulness. It is, however, now clear that the defendants did not, in 1992, know that Morris Pina, Jr. was HIV positive. They did not learn this fact until February 13, 1996.

As the litigation progressed, Mr. Griffith did not cause Delores Gonsalves to supplement her answers to Mr. Lawrence's interrogatories asking whether Morris Pina, Jr. had any disease. Mr. Griffith acknowledged on February 14, 1996 that this deliberate conduct violated his duty under Fed. R.Civ.P. 26(e)(2).[46] Fed.R.Civ.P. 26(e)(2) provides, in pertinent part, that: "A party is under a duty seasonably to amend a prior response to an interrogatory .. if the party learns that the response is in some material respect incomplete or incorrect and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing." Mr. Griffith claims, in mitigation, that he thought that the defendants had the relevant information. However, as Professors Wright and Miller explain, the duty to supplement is excused only if the information at issue has "already been revealed by a witness in a deposition or otherwise through formal discovery, or, alternatively, by providing the additional information in writing."[47] Relying on the relevant Advisory Committee

41. *Id.*

42. Attachment to Plaintiff's Motion in Limine Regarding Records of St. Luke's Hospital and Addiction Center, February 12, 1996.

43. M.G.L. ch. 111 § 70F (1986).

44. Transcript, February 14, 1996, p. 20.

45. Response to Defendants' Motion for Sanctions, May 16, 1996, p. 9; Transcript, February 14, 1996, pp. 20–21.

46. Transcript, February 14, 1996, p. 121.

47. Wright & Miller § 2049.1, p. 604.

Note, Professors Wright and Miller also state: "It is apparent that the knowledge of the lawyer must be regarded as the knowledge of the party for [the purpose of supplementation] as it is for purposes of discovery generally."[48] It is evident that Robert Griffith was aware of his duty to supplement answers to interrogatories generally. He filed three more supplementary responses to Hoffman's interrogatories in July, October, and December 1993.[49] Yet he continued to cause Delores Gonsalves not to reveal Dr. Chowdri's treatment of Morris Pina, Jr. or Morris Pina, Jr.'s HIV status.

Prior to trial, over the objection of the defendants, Mr. Griffith persuaded the court that if the plaintiff prevailed, hedonic damages would be recoverable to compensate the plaintiff for the loss of the enjoyment of Morris Pina, Jr.'s life by Mr. Pina.[50] On December 6, 1995, Mr. Griffith indicated that he would seek to introduce "life tables" (which provide information on average human life expectancies) as evidence relevant to the calculation of hedonic damages. Mr. Griffith did not then inform the court that Mr. Pina was HIV positive.

■ On December 7, 1995, at the outset of his opening statement, Mr. Griffith told the jury that when Morris Pina, Jr. was brought into the New Bedford Police Department, "[h]e was uninjured. He had no abrasions and he had no lacerations and he had no bruises. He was healthy."[51] In view of Mr. Pina's HIV status, the statement that he was "healthy" was at least misleading. The statement also suggests to the court that Mr. Griffith did not believe that the defendants knew that Morris Pina, Jr. was HIV positive because it would have been a tactical error for experienced counsel to make a representation in his opening argument which he expected could and would be easily refuted.

In any event, on December 7, 1995, the defendants did not know that Morris Pina, Jr. had been HIV positive. However, as they focused on various medical records in preparing to question witnesses at trial, certain discrepancies were discerned. Over the Christmas break, Austin Joyce, Esq., attorney for the defendants John Hoffman and Robert Devlin, noticed that certain dates seemed to be missing from the St. Luke's records.[52] Similarly, and subsequently, Sheila Tierney, Esq., counsel for defendant Patrick Lawrence, noticed that the records obtained from the Bridgewater Addiction Center indicated that Morris Pina, Jr. had reported to the Center and that he had been tested negative for HIV at St. Luke's on June 6, 1988. The defendants realized, however, that they had no St. Luke's records concerning the testing, admission, or treatment of Morris Pina, Jr. on or around that date.[53] Ms. Tierney also noticed that while one of the plaintiff's experts interpreted the autopsy results as indicating that Morris Pina, Jr. had chronic hepatitis, there were no records indicating that he had been diagnosed or treated for that disease.

Accordingly, the defendants subpoenaed the Keeper of the Records of St. Luke's to testify at trial and so informed Mr. Griffith. On February 12, 1996, as the end of the plaintiff's case in chief was approaching, several relevant events occurred. First, Mr. Griffith informed the court that he would soon seek to introduce the life tables previously discussed on December 6, 1995.[54] The defendants objected to the admission of the life tables.[55] The court noted that there was a question of the probative value of such averages for someone like Mr. Pina who was known to have a drug addiction.[56] This concern was clearly relevant to the Fed.R.Evid. 403 "balancing" in which the court would be required to engage to decide the admissibili-

---

**48.** *Id.,* § 2049, pp. 601–02 (citing Rule 26(e) Advisory Committee Note (1970)).

**49.** *See supra* note 24.

**50.** *See supra* text accompanying note 10.

**51.** Transcript, December 7, 1995, p. 49.

**52.** Transcript, February 14, 1996, p. 14.

**53.** *Id.* at 13.

**54.** Transcript, February 12, 1996, p. 27.

**55.** *Id.* at 28.

**56.** *Id.* at 27.

ty of the life tables.[57] This concern would have been heightened greatly if the court knew that Mr. Pina had been HIV positive. Yet Mr. Griffith did not disclose this fact. He evidently intended to remain silent, knowing that the court was about to make a decision based on materially misleading information.

Second, on February 12, 1996, in response to a question from Ms. Tierney, Delores Gonsalves testified that she learned from the autopsy report that her brother had chronic hepatitis and that she believed that he was receiving treatment for the disease from Dr. Chowdri.[58] Ms. Tierney knew that Dr. Chowdri was regarded as the "AIDS doctor" in New Bedford, but she did not allude to this fact during her questioning.

Third, on February 12, 1996, Mr. Griffith filed a motion in limine seeking to exclude the records of St. Luke's. He asserted that the defendants had represented to him that they did not want the records in evidence and that, in reliance on this representation, he did not seek to introduce the records when his medical experts were testifying.[59] He wrote that the defendants were "deceptive" and that they should not be allowed to introduce the St. Luke's records.[60]

On February 13, 1996, a day off from the trial, Ms. Tierney obtained Dr. Chowdri's records concerning Morris Pina, Jr. pursuant to a subpoena which she had issued on February 12. She then learned that Morris Pina, Jr. was HIV positive. She also learned that Mr. Griffith had discovered this fact in July 1991.

Also on February 13, Mr. Griffith sent Delores Gonsalves to St. Luke's to obtain Mr. Pina's records in an effort to determine what, if anything, they contained in addition to what he had received from Mr. Folan in May 1992. When Delores Gonsalves returned home with the records, she opened them and learned, for the first time, that her brother had been HIV positive.[61] In addition, on February 13, Mr. Griffith consulted his partners on the question of how to deal with this issue.[62] The court doubts, however, that he gave them accurate and complete information concerning all that had transpired.

■ On February 14, 1996, in a lobby conference, Mr. Griffith accused Mr. Folan of seeking to deceive him by not producing the St. Luke's records concerning Morris Pina, Jr.'s May 1988 admittance to St. Luke's.[63] Mr. Griffith indicated to the court that he had only received the records the preceding day, leading the court to understand and state that Mr. Griffith learned for the first time on February 13, 1996 that Morris Pina, Jr. was HIV positive.[64]

Mr. Griffith acknowledged that the information was relevant to the questions of Mr. Pina's life expectancy and enjoyment of life. He said: "I think the problem comes in that obviously that's something I would have said right in my opening." [65] This last comment led the court and defense counsel to understand that Mr. Griffith was asserting that if he had known Morris Pina, Jr. was HIV positive, he would have mentioned this fact in his opening. Reading the transcript in context now, it appears possible that Mr. Griffith meant that if he had thought that this information was going to be introduced in evidence, he would have mentioned it in his opening. This interpretation, however, is not particularly exculpatory, in part because it is inconsistent with Mr. Griffith's assertion that since May 1992, he had believed that the defendants knew that Morris Pina, Jr. was

57. Fed.R.Evid. 403 provides: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

58. Transcript, February 12, 1996, p. 129.

59. Plaintiff's Motion in Limine Regarding Records of St. Luke's Hospital and Addiction Center, February 12, 1996, p. 2.

60. Id.

61. Transcript, February 15, 1996, p. 49.

62. Transcript, February 14, 1996, p. 18.

63. Id. at 10–11.

64. Id. at 17.

65. Id. at 18.

HIV positive and that they intended to present this evidence in their case-in-chief.

In any event, at the February 14, 1996 lobby conference, Ms. Tierney disclosed that she knew that Dr. Chowdri customarily treated all of the HIV positive individuals in New Bedford and that she had obtained records from him concerning Morris Pina, Jr. the previous day.[66] Counsel for the City of New Bedford, Patrick Walsh, Esq., then asked Mr. Griffith if he was claiming that he did not learn of Morris Pina, Jr.'s HIV positive status until the previous day.[67] Mr. Griffith responded that he "knew .. when discovery was started." [68]

Following this revelation, there was some discussion of the plaintiff's answers to interrogatories and whether the plaintiff should be precluded from introducing evidence indicating that Morris Pina, Jr. was HIV positive.[69] The discussion was temporarily suspended so that certain testimony being presented to the jury could resume.[70] At the conclusion of that testimony, discussion of the HIV issue continued in the lobby. Mr. Griffith admitted that he should have disclosed Morris Pina, Jr.'s HIV status in his final supplement to the interrogatories, but he explained that he was under the impression that the defendants had received Dr. Chowdri's records from St. Luke's and that they were hiding this information from him.[71] Mr. Griffith told the Court that the original interrogatories only asked where Morris Pina, Jr. was treated and did not call for disclosure of Morris Pina, Jr.'s HIV status.[72]

At that point, Ms. Tierney disclosed that she had learned from Dr. Chowdri's office the previous day that Mr. Pina's records disclosing the HIV status were sent to Mr. Griffith on July 2, 1991.[73] Immediately thereafter, in response to a direct question from Armand Fernandes, Esq., counsel for defendant Richard Benoit, Mr. Griffith stated that he knew that Morris Pina, Jr. was HIV positive "right from the beginning." [74] Once again, Mr. Griffith asserted that the defendants never propounded an interrogatory which should have resulted in the disclosure of Morris Pina, Jr.'s HIV status.[75] Rather, he reiterated that the interrogatories only asked about "medical records" and that he did not turn over the records which he had received from Dr. Chowdri because he believed that they were already in the defendants' possession.[76] Mr. Griffith also claimed that his failure to disclose Morris Pina, Jr.'s HIV status should be viewed in the context of the defendants' "numerous discovery violations." [77]

As the previous findings of fact demonstrate, Mr. Griffith's statements to the court on February 14, 1996 were false and misleading in many respects. In addition, Mr. Griffith hypocritically accused his adversaries of the deception he himself had been practicing from the outset of the case. The court makes no finding as to whether Mr. Griffith deliberately misrepresented the many matters he described incorrectly to the court. The HIV issue arose quickly, after two months of an arduous trial. Mr. Griffith was apparently focusing primarily on the evidentiary implications of the issue of Mr. Pina's HIV status. Some of his answers were so patently false or misleading that the court infers that he did not previously examine the interrogatories and the timing of the plaintiff's deceptive responses.

In essence, the court concludes that Mr. Griffith engaged in deliberate misconduct in connection with Ms. Gonsalves' responses to the defendants' interrogatories and, in the

---

66. *Id.* at 18.

67. *Id.* at 19.

68. *Id.*

69. *Id.* at 24–28.

70. *Id.* at 24.

71. *Id.* at 121–22.

72. *Id.* at 130.

73. *Id.* at 132.

74. *Id.* at 133.

75. *Id.* at 133.

76. *Id.* at 134.

77. *Id.*

heat of battle, compounded that misconduct by engaging in a preemptive strike against defense counsel, and by not being forthcoming and candid with the court as his misconduct was gradually revealed. The pace and pressure of the trial may, to some extent, explain Mr. Griffith's false and misleading statements to the court, but they do not excuse them. Nor do they excuse his unfounded characterization of defense counsel as "deceptive."

In any event, I acted promptly, and I believe effectively, to keep the defendants from being unfairly prejudiced by their belated discovery that Morris Pina, Jr. was HIV positive. More specifically, pursuant to Fed. R.Civ.P. 37(b)(2), I refused to let the plaintiff introduce evidence of Mr. Pina's HIV status into evidence.[78] I also permitted the defendants to conduct a voir dire of Ms. Gonsalves to prepare for their further examination of her in their case-in-chief on the issue of Mr. Pina's HIV status and its implications for Ms. Gonsalves' credibility generally.[79] I permitted the defendants to call Dr. Chowdri as a witness.[80] Finally, I allowed the defendants to recall Ms. Gonsalves at a time which they considered to be most effective in order to explore the deception in which she and her attorney had engaged.[81] I do not believe that the jury's verdict was tainted by the belated disclosure of Mr. Pina's HIV status. Indeed, it may be that the defendants received some benefit from the belated disclosure, although not enough to prevail in Phase One of the case.

In any event, I also stated that the issue of possible sanctions to be imposed against Mr. Griffith and Ms. Gonsalves personally would be addressed after trial. After Phase Two of the trial, and before the case was settled, the defendants filed a motion for sanctions against "plaintiff and her various counsel." [82] Mr. Griffith, represented by Janis Berry, Esq., responded [83] and the issue was addressed briefly at the May 22, 1996 hearing on the post-trial motions.[84] A lengthy hearing devoted exclusively to the question of sanctions was held on June 24, 1996.

III. Sanctions

■ After careful reflection, I conclude that Robert Griffith deliberately caused Delores Gonsalves to respond falsely to the defendants' interrogatories. Without substantial justification and in bad faith, he also directly violated his duties under Fed. R.Civ.P. 26(g)(2). Accordingly, Rule 26(g)(3) requires the imposition of "an appropriate sanction." [85] This mandate is rooted in, and reinforced by, the court's inherent power to impose sanctions on an attorney for his or her bad faith.[86]

In the circumstances of this case, I find that it is most appropriate that the sanction be paid exclusively by Mr. Griffith rather than being paid, in whole or in part, by Ms. Gonsalves. More specifically, I find that Mr. Griffith's misconduct was not impulsive or isolated. Prior to his filing of this suit, he made a conscious decision to attempt to conceal Morris Pina, Jr.'s HIV status. He repeatedly caused Ms. Gonsalves to file false

78. Transcript, February 15, 1996, p. 32.

79. *Id.* at 37.

80. *See* Transcript, February 27, 1996, pp. 22–73.

81. Transcript, February 15, 1996, p. 32.

82. Defendants' Motion for Sanctions Against Plaintiff and Her Counsel, May 3, 1996, p. 1.

83. *See* Response to Defendants' Motion for Sanctions, May 16, 1996.

84. Transcript, May 22, 1996, pp. 95–112.

85. Fed.R.Civ.P. 26(g)(3) provides, in full:
 If without substantial justification a certification is made in violation of the rule, the court,

upon motion or upon its own initiative, shall impose upon the person who made the certification, the party on whose behalf the disclosure, request, response, or objection is made, or both, an appropriate sanction, which may include an order to pay the amount of the reasonable expenses incurred because of the violation, including a reasonable attorney's fee.

86. *See* Rule 26(g) Advisory Committee Note (1983); *Chambers v. NASCO*, 501 U.S. 32, 43–46, 111 S.Ct. 2123, 2132–34, 115 L.Ed.2d 27 (1991); *Hutto v. Finney*, 437 U.S. 678, 689 n. 14, 98 S.Ct. 2565, 2573 n. 14, 57 L.Ed.2d 522 (1978); *Stefan v. Laurenitis*, 889 F.2d 363, 370 (1st Cir.1989); *Malautea v. Suzuki Motor Co.*, 987 F.2d 1536, 1544 (11th Cir.1993).

answers to interrogatories, and he repeatedly failed to satisfy his duties under Rule 26(g)(2) and (e).

Mr. Griffith's misconduct was not excused or mitigated by the defendants' recalcitrance in discovery. At the time of Ms. Gonsalves' first false answers to interrogatories, only one motion to compel had been filed by the plaintiff. That motion had been filed the day before the false interrogatory answers were provided to the defendants. More importantly, if Mr. Griffith felt that the plaintiff was being taken advantage of in discovery, he had the right to seek a protective order from the court under Fed.R.Civ.P. 26(c).[87] Such an order could have allowed Ms. Gonsalves to defer her responses to interrogatories until defendants had properly provided her with the discovery which she had requested. The Advisory Committee Notes to Rule 26(g) expressly encourage courts to take into account any failure to seek a protective order in determining the appropriate sanction to be imposed for a violation of Rule 26(g)(2).[88] The lesson to be drawn by counsel in this case, and by counsel in all cases, is that no conduct by an adversary justifies an attorney's decision to cause or permit the filing of false answers to interrogatories.

I also find that Mr. Griffith's misconduct was serious. It exposed Ms. Gonsalves to possible investigation and prosecution for perjury with regard to her answers to interrogatories. I note, however, that I do not believe that Ms. Gonsalves committed perjury because, in view of her attorney's conduct, she did not act willfully as required by 18 U.S.C. § 1621.[89]

Mr. Griffith's conduct also threatened the integrity of the trial. If defendants' counsel had not been resourceful and fortunate enough to discover the St. Luke's records, or if Ms. Tierney had not known that Dr. Chowdri was the New Bedford "AIDS doctor," Mr. Pina's HIV status would not have been known by the jury. As a result, the plaintiff could have been awarded more damages than she would otherwise have been entitled to recover.

In addition, Mr. Griffith's misconduct threatened the finality of the jury's verdict and the victory that he had achieved. Fed. R.Civ.P. 60(b) provides, in part, that "the court may relieve a party ... from a final judgment for ... (3) ... misrepresentation, or other misconduct of an adverse party...." As the Court of Appeals for the First Circuit has explained, "[f]ailure to disclose or produce materials requested in discovery can constitute 'misconduct' within the purview of this [Rule]."[90] Moreover, " 'misconduct' does not demand proof of nefarious intent or purpose as a prerequisite to redress."[91] This case involved the longest trial I have ever conducted, lasting over four months. If Mr. Griffith's misconduct concerning Mr. Pina's HIV status had been discovered after trial, a serious question would have been presented as to whether any or all of the judgments for the plaintiff should have been vacated. While fairness may have required such relief, it would have imposed great costs on the parties and on the administration of justice.

Accordingly, I find that Mr. Griffith deliberately engaged in serious misconduct without substantial justification. Thus, the court must fashion an appropriate sanction. The Court of Appeals for the First Circuit has stated, in the context of violations of Fed. R.Civ.P. 11, that sanctions serve two main

---

87. Fed.R.Civ.P. 26(c) provides, in part, that: "Upon motion by a party or by the person from whom discovery is sought ... the court in which the action is pending ... may make any order which justice requires to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense...."

88. Fed.R.Civ.P. 26(g) Advisory Committee Note (1983).

89. 18 U.S.C. § 1621 states, in part, that:

Whoever having taken an oath ... that he will testify, declare, depose, or certify truly, or that any written testimony, declaration, deposition, or certificate by him subscribed, is true, willfully and contrary to such oath states or subscribes any material matter which he does not believe to be true ... is guilty of perjury....

90. *Anderson v. Cryovac*, 862 F.2d 910, 923 (1st Cir.1988).

91. *Id.*

purposes: deterrence and compensation.[92] Because this case has been settled, defendants' counsel agreed at the June 24, 1996 hearing that compensation to them is not appropriate. However, as the Advisory Committee Notes to Rule 26(g) explain, the Supreme Court has indicated that: "Sanctions to deter discovery abuse would be more effective if they were diligently applied 'not merely to penalize those whose conduct may be deemed to warrant such a sanction, but to deter those who might be tempted to such conduct in the absence of such a deterrent.' "[93]

 This court recognizes that sanctions are "a potent weapon and should, therefore, be deployed in a balanced manner" and that they should be imposed in proportion to the magnitude of the misconduct.[94] In the memorandum filed on behalf of Mr. Griffith in opposition to the defendants' motion for sanctions, Mr. Griffith acknowledged that "his contact with Dr. Chowdri in 1991 as well as Morris Pina, Jr.'s HIV status should have been disclosed to the Defendants."[95] In this submission, Mr. Griffith recommended that the court impose a sanction of $5,000 and that it decline to vacate the judgment or deny any award of attorneys' fees, as was then being advocated by the defendants.[96]

As I said prior to the settlement, vacating the judgment would not have been appropriate. At trial, I took effective measures to eliminate any potential unfair prejudice to the defendants from the delayed disclosure. Moreover, in the circumstances, it would have been anomalous and inappropriate to vacate a judgment based on a proven cover-up of the civil rights violations which had caused Mr. Pina's death because of misconduct by an attorney in the form of a delayed disclosure. In any event, the issue of vacat-

ing the judgment has been rendered moot by the settlement.

Nevertheless, I conclude that the $5,000 sanction suggested by Mr. Griffith is inadequate and have determined that a sanction of $15,000 is most appropriate. The reasons for this amount include the following. First, as described earlier, Mr. Griffith's deliberate and repeated misconduct was very serious. Second, although Mr. Griffith expressed what the court regards as sincere contrition at the June 24, 1996 hearing, the court is concerned that he did not then fully appreciate the nature and magnitude of his misconduct. When the concealment of Mr. Pina's HIV status began to unravel on February 14, 1996, Mr. Griffith sought to justify his misconduct by beginning his argument with a recitation of the events of May 1992 relating to Mr. Folan's receipt and distribution of the St. Luke's records.[97] Mr. Griffith did not then acknowledge or candidly explain that his deceptive strategy was developed before this case was filed. Nor did he indicate that the improper strategy was first executed in the January 1992 answers to interrogatories. Rather, he continued the deception, either deliberately or carelessly, in his representations to the court on February 14, 1996. Similarly, after time for reflection, the May 16, 1996 memorandum filed on behalf of Mr. Griffith by Ms. Berry focused on the purportedly mitigating factor of Mr. Folan's acquisition of the St. Luke's documents in May 1992, rather than on Mr. Griffith's pre-existing and unprovoked misconduct.[98] Ms. Berry's argument on June 24, 1996 had the same focus, at least until it was shifted by questions from the court.[99]

The court believes, however, that a $15,000 sanction is necessary and appropriate to

92. *Navarro–Ayala*, 968 F.2d at 1426.

93. Fed.R.Civ.P. 26(g) advisory committee note (1983) (quoting *National Hockey League v. Metropolitan Hockey Club*, 427 U.S. 639, 643, 96 S.Ct. 2778, 2781, 49 L.Ed.2d 747(1976)).

94. *Navarro–Ayala*, 968 F.2d at 1426–27.

95. Response to Defendants' Motion for Sanctions, May 16, 1996, p. 5.

96. *Id.* at 3.

97. Transcript, February 14, 1996, pp. 19–20.

98. Response to Defendants' Motion for Sanctions, May 16, 1996, pp. 8–9.

99. These observations are not meant as a criticism of Ms. Berry. She is an able lawyer, who was evidently representing her client's view of the matter as it existed as recently as June 24, 1996.

cause Mr. Griffith to recognize the true quality of his misconduct, and to deter him and others from repeating it. In calculating the amount of the sanction, the court has considered the fact that the settlement provided for more than $231,000 in attorneys' fees, most of which were earned by Mr. Griffith. A $15,000 sanction impresses the court as proportional to his fee, earned over six years of hard work. If a much higher amount of attorneys' fees had been awarded in the absence of a settlement, the sanction imposed would have been proportionally greater. Essentially, however, the court feels that there is a reasonable range of financial sanctions for Mr. Griffith's violation of Fed.R.Civ.P. 26(g)(2). $15,000 may be toward the upper end of that range. If so, in view of Mr. Griffith's conduct at trial concerning Morris Pina, Jr.'s HIV status, a sanction near the upper end of the reasonable range is most appropriate. I have not increased the amount of the sanction which I would have otherwise imposed in order to send a message to other members of the bar who may be tempted to engage in comparable misconduct. I believe, however, that the amount of the sanction I have selected should provide appropriate instruction and deterrence to them.

As I indicated earlier, I have also decided not to exercise my authority under the Local Rules of the United States District Court for the District of Massachusetts to refer this matter to the Board of Bar Overseers.[100] I recognize, however, that the Board of Bar Overseers has the power to consider this matter on its own initiative. I have chosen not to refer this matter to the Board for several reasons. First, as I said at the outset, Mr. Griffith displayed commendable qualities in taking this case, persevering, and proving that employees of the Police Department in New Bedford violated Morris Pina, Jr.'s civil rights, caused his death, and, to some extent, succeeded in covering up these constitutional violations. Second, it is not clear to me whether any of the defendants will be disciplined or suspended from the New Bedford Police Department. That is not a matter for the court. However, it would be arguably anomalous if Mr. Griffith was suspended from his profession and the defendants were not. Third, and more significantly, I believe that there is value to finality regarding this matter—as there was value to settling the case. Morris Pina, Jr.'s death generated a long ordeal for everyone involved. I feel that Mr. Griffith is entitled to some respite from the combat, although not from the consequences of his misconduct. He should properly take pride in much of what he did and achieved in this case. He must also live, however, with the perception of him by attorneys and others who learn of his misconduct though this decision, which I will publish.

Based on my intensive exposure to Mr. Griffith over the past nine months, I believe that a $15,000 sanction will serve as a meaningful and enduring penalty for his misconduct. I also believe that Mr. Griffith, like almost all members of the bar, cares about his reputation. He is a former Assistant Attorney General for the Commonwealth of Massachusetts. In prosecuting this civil rights case, he acted, in effect, as a "private attorney general". He made a serious mistake in this case. It is regrettable that Mr. Griffith did not understand the wisdom of former Attorney General Robert Jackson's advice to a gathering of United States Attorneys in 1940. Robert Jackson had been a distinguished lawyer in the small community of Jamestown, New York. He went on to become Solicitor General and Attorney General of the United States. He then became a member of the Supreme Court, from which he took leave to become the chief American prosecutor of Nazi war criminals at the Nuremberg trials. In 1940, while he was the Attorney General, he assembled all of the

---

**100.** U.S.Dist.Ct.D.Mass.Rule 83.6(5)(A) provides that:

> When misconduct or allegations of misconduct that, if substantiated, would warrant discipline on the part of an attorney admitted to practice before this court shall come to the attention of a judge of this court, whether by complaint or otherwise, and the applicable procedure is not otherwise mandated by these rules, the judge shall refer the matter to counsel for investigation and the prosecution of a form[al] disciplinary proceeding or the formulation of such other recommendation as may be appropriate.

United States Attorneys at the Department of Justice in Washington, D.C., and, in words which resonate now, explained that:

> The lawyer ... is justified in seeking to leave behind him a good record. But, he must remember that his most alert and severe, but just, judges will be the members of his own profession, and that lawyers rest their good opinion of each other not merely on results accomplished, but on the quality of the performance. Reputation has been called "the shadow cast by ones daily life." [101]

As I expect Mr. Griffith will increasingly come to understand, no lawyer should risk that reputation, no matter how important the case or seductive the prospect of success.

## IV. ORDER

Accordingly, for the foregoing reasons, it is hereby ORDERED that Robert Griffith, Esq. shall by August 16, 1996 pay, as sanctions, $15,000, to the Clerk of the United States District Court for the District of Massachusetts.

---

**101.** Robert H. Jackson, *The Federal Prosecutor,* 24 Journal of the American Judicature Society 18, 19 (June 1940).