ST. PAUL REINSURANCE COMPANY, LTD., CNA Reinsurance Company, Ltd., and Zurich Reinsurance (London) Limited, Plaintiffs,

v.

COMMERCIAL FINANCIAL CORP., Defendant,

Commercial Financial Corp. and Security State Bank, Counterclaim Plaintiffs,

v.

St. Paul Reinsurance Company, Ltd., CNA Reinsurance Company, Ltd., Zurich Reinsurance (London) Limited, Professional Claims Managers, Inc., and U.S. Risk Underwriters, Inc., Counterclaim Defendants.

No. C00–4080.

United States District Court, N.D. Iowa, Western Division.

Dec. 19, 2000.

Michael W. Ellwanger, Rawlings, Neiland, Probasco, Ellwanger, Jacobs, et al., Sioux City, IA, David H. Paige, Gil Isidro, Nicolet-

ti, Hornig, Campise & Sweeney, New York City, for plaintiffs.

Michael R. Reck, Belin, Lamson, McCormick, Zumbach, Flynn, Des Moines, IA, for defendants.

**MEMORANDUM OPINION AND ORDER REGARDING DEFENDANT COMMERCIAL FINANCIAL CORPORATION'S MOTION TO COMPEL DISCOVERY RESPONSES AND FOR AN AWARD OF SANCTIONS**

BENNETT, Chief Judge.

TABLE OF CONTENTS

I.   *INTRODUCTION* ............................................... 623

II.  *LEGAL ANALYSIS* ........................................... 624
    A.  *"First–Party" Bad Faith Claims Under Iowa Law* ......................... 624
    B.  *Privilege Issues* ............................................ 626
        1.  *Arguments of the parties* ............................... 626
        2.  *Applicable law and burden of proof* ....................... 627
        3.  *Work product privilege* ................................. 628
           a.  *General principles* ................................ 628
           b.  *Insurance claims files* ............................. 630
              i.  *Decisions within this Circuit* ..................... 630
              ii.  *Other courts* ............................... 634
           c.  *Applicability of the work product privilege* .... , ................ 636
           d.  *Waiver* ...................................... 639
        4.  *Attorney–client privilege* .............................. 641
        5.  *Relevance* ........................................ 642
    C.  *Prior "Bad Faith" Claims* ................................... 643
    D.  *Sanctions* ................................................ 645

III.  *CONCLUSION* .............................................. 645

Despite the court's prior imposition of sanctions and warnings to the parties to make every effort to resolve their discovery disputes reasonably and informally, certain discovery issues have defied resolution without further judicial intervention. Those issues arise in the context of the defendant's counterclaim of "first-party bad faith" against the plaintiff insurers arising from their denial of the defendant's claim against an employment practices liability insurance policy. They concern the insurers' allegedly abusive assertions of attorney-client and work product privilege and their refusal to disclose any information about prior "bad faith" claims against them on the grounds of irrelevance and undue burdensomeness.

## I. INTRODUCTION

This lawsuit began on July 24, 2000, with the plaintiff insurers' filing of an action for declaratory judgment pursuant to 28 U.S.C. § 2201 for the purpose of construing the rights and legal relations of the parties arising from a contract of insurance entered into between St. Paul Reinsurance Company, Ltd., CNA Reinsurance Company, Ltd., and Zurich Reinsurance (London) Limited (hereinafter jointly referred to as the "London Insurers"), on the one hand, and Commercial Financial Corporation ("CFC"), on the other. In their declaratory judgment action, the London Insurers seek rescission of a contract for employment practices insurance between CFC and U.S. Risk Underwriters, Inc. ("U.S. Risk") based upon what the London Insurers allege were material misrepresentations by CFC in the process of applying for insurance coverage. Specifically, the London Insurers allege that CFC failed to disclose that, in October 1999, it had terminated three employees of third-party plaintiff Security State Bank, a bank CFC had recently acquired, as CFC should have done in connection with its February 9, 2000, request that Security State Bank be added to an existing employment practices liability insurance policy. The London Insurers contend that CFC failed to make the disclosure of the terminations, even though CFC knew that such information was material to the risk that the London Insurers assumed in issuing an employment practices liability insurance policy. The London In-

surers therefore contend that CFC's actions constituted fraud. CFC responded on September 5, 2000, with its Answer, Counterclaim, and Third–Party Complaint, in which it asserts, *inter alia,* that the London Insurers acted in bad faith in denying CFC's claim against the employment practices liability insurance policy for coverage of the employment discrimination claims by the employees terminated from Security State Bank in October 1999.

Discovery in this case has been remarkably contentious. Indeed, in a published ruling, *St. Paul Reins. Co., Ltd. v. Commercial Fin. Corp.,* —— F.Supp.2d ——, 2000 WL 1737746 (N.D.Iowa Nov.22, 2000), this court *sua sponte* imposed non-monetary sanctions for objections to discovery asserted by the London Insurers, which the court found were some of the most obstructionist and frivolous objections to discovery that the undersigned has ever seen, either in the practice of law, or on the bench, as a United States Magistrate Judge or United States District Court Judge. By a separate order, dated December 1, 2000, the court established a discovery plan and briefing schedule intended to provide for the resolution of all remaining discovery disputes.

At a telephonic conference on December 13, 2000, the parties advised the court that they have been unable to resolve amicably, reasonably, or informally two discovery disputes. Consequently, those matters are now before the court. The two remaining disputes concern the London Insurers' continued assertion of attorney-client and work product privilege as to various documents requested by CFC and the London Insurers' refusal to provide responses to CFC's discovery requests concerning prior bad faith claims against them on the grounds that the information concerning such bad faith claims is not relevant to CFC's own bad faith counterclaim or, if somehow relevant, that production of the requested information would be too burdensome. Because the parties contemplate a series of depositions beginning on or about December 20, 2000, to which the requested discovery responses would likely be relevant, the court has moved with speed, but not with haste, to provide as prompt a

ruling on the present motions as due consideration of the merits would permit.

## II. LEGAL ANALYSIS

The court undertakes to resolve here the two persistent and vexing discovery issues remaining in this case. Although there is no necessary connection between the way the privilege issue is resolved, and the way the prior bad faith claims issue is resolved, there is a common thread between these discovery issues. That thread is that the resolution of both discovery issues may depend, at least in part, on the nature of CFC's bad faith counterclaim to which CFC contends that the materials at issue are relevant. Thus, the court will begin with a brief survey of the nature of CFC's bad faith counterclaim under Iowa law, then turn to separate consideration of the privilege and "other claims" issues.

### A. "First–Party" Bad Faith Claims Under Iowa Law

The Iowa Supreme Court has recognized both "first-party" and "third-party" bad faith claims against insurers. *See Dolan v. Aid Ins. Co.,* 431 N.W.2d 790 (Iowa 1988). In *Kooyman v. Farm Bureau Mut. Ins. Co.,* 315 N.W.2d 30, 33–34 (Iowa 1982), the Iowa Supreme Court recognized the "third-party" variety of the tort—that is, a cause of action by a third party against an insurer asserting that the insurer acted in bad faith in its representation of its insured with regard to the third-party's claim against the insured's policy. *Dolan,* 431 N.W.2d at 790. Somewhat later, in *Dolan v. Aid Ins. Co.,* 431 N.W.2d 790 (Iowa 1988), the Iowa Supreme Court also recognized a "first-party" bad faith cause of action—that is, a cause of action by an insured against its insurer alleging that the insurer acted in bad faith in its treatment of the insured's insurance claim. *See Stahl v. Preston Mut. Ins. Ass'n,* 517 N.W.2d 201, 203 (Iowa 1994). A "first-party" variety of "bad faith" claim is at issue here.

As the Iowa Supreme Court has explained,

We adopted the first-party tort of bad faith in *Dolan* because "traditional damages for breach of contract will not always adequately compensate an insured for an

insurer's bad faith conduct." 431 N.W.2d at 794; *see, e.g., Nassen v. National States Ins. Co.,* 494 N.W.2d 231 (Iowa 1992). We explained that "the nature of the contractual relationship between the insurer and insured" justified this conclusion. *Dolan,* 431 N.W.2d at 794. Though we declined to recognize a fiduciary relationship in first-party situations, we determined that a bad faith tort would serve to redress the "inherently unequal bargaining power" between the insurer and insured. *Id.*

*Stahl,* 517 N.W.2d at 203. The Iowa Supreme Court has repeatedly stated the elements of proof for such a claim, as follows:

> To be successful in a first-party bad faith claim, a plaintiff must prove by substantial evidence (1) the absence of a reasonable basis for denying the claim, and (2) that the defendant knew or had reason to know that its denial was without a reasonable basis. *Sampson v. American Standard Ins. Co.,* 582 N.W.2d 146, 149 (Iowa 1998).

*Seastrom v. Farm Bureau Life Ins. Co.,* 601 N.W.2d 339, 346 (Iowa 1999); *Sampson v. American Standard Ins. Co.,* 582 N.W.2d 146, 149–50 (Iowa 1998); *Morgan v. American Family Mut. Ins. Co.,* 534 N.W.2d 92, 96 (Iowa 1995); *Brown v. Danish Mut. Ins. Ass'n,* 550 N.W.2d 171, 175 (Iowa Ct.App. 1996); *AMCO Mut. Ins. Co. v. Lamphere,* 541 N.W.2d 910, 914 (Iowa Ct.App.1995).

As to the first element of the tort,

> An insurance company has the right to challenge claims that are "fairly debatable" without being subject to a bad faith tort claim. [*Sampson,* 582 N.W.2d] at 150. Thus, when an objectively reasonable basis for denying a claim exists, the insurer cannot be held liable for bad faith as a matter of law. *Id.* The debate may involve a dispute concerning an issue of fact or law. *Id.* The reasonable basis for denying the claim, however, must exist at the time the claim is denied. *Id.*

*Seastrom,* 601 N.W.2d at 346–47; *Sampson,* 582 N.W.2d at 150; *Morgan,* 534 N.W.2d at 96. " 'The absence of a reasonable basis for denying the claim is an objective element.' " *Sampson,* 582 N.W.2d at 150 (quoting *Morgan* ); *Reuter v. State Farm Mut. Auto. Ins. Co.,* 469 N.W.2d 250, 253 (Iowa 1991).

While the first element of the tort is an objective one, the second element—the "knew or reasonably should have known" element—is a "subjective" element. *Brown,* 550 N.W.2d at 175 (citing *Reuter,* 469 N.W.2d at 253). In *Reuter,* the Iowa Supreme Court considered the relevance of the insurer's investigation to the "knowledge" element:

> Reuter argues State Farm must properly investigate and evaluate the medical expense claim before it can urge the claim is "fairly debatable." In response, State Farm cites *Pirkl* [*v. Northwestern Mut. Ins. Ass'n,* 348 N.W.2d 633 (Iowa 1984),] where in a first-party case, we said "the insurer has no clearly defined duty to investigate and may require the insured to present adequate proof of loss before paying the claim." *Pirkl,* 348 N.W.2d at 633.
>
> If an objectively reasonable basis for denial of a claim actually exists, the insurer, as a matter of law, cannot be held liable for bad faith. Thus, an insurer's intentional, reckless, or negligent failure to investigate or evaluate a claim is only an element by which the insured may prove that no lawful basis for refusal existed. The insurer's "subpar" investigation cannot in and of itself sustain a tort action for bad faith. The lack of proper investigation and evaluation is significant in proving the crucial element of a bad-faith tort, namely knowledge by the insurer of the lack of a debatable reason for denial. *See Gulf Atl. Ins. Co. v. Barnes,* 405 So.2d 916, 924 (Ala. 1981); *State Farm Fire & Casualty Co. v. Balmer,* 891 F.2d 874, 877 (11th Cir.1990), *aff'g, State Farm Fire & Casualty Co. v. Balmer,* 672 F.Supp. 1395 (M.D.Ala.1987). Although subjective bad faith may be inferred from an insurer's flawed investigation, an improper investigation, standing alone, is not sufficient cause for recovery if the insurer in fact has an objectively reasonable basis for denying the claim. *Pace v. Insurance Co. of N. Am.,* 838 F.2d 572, 584 (1st Cir.1988).

*Reuter,* 469 N.W.2d at 254–55. In *Seastrom,* the Iowa Supreme Court again explained the

relevance of investigation to a first-party bad faith claim:

> It is clear Farm Bureau investigated the claim, even if such investigation was not as thorough or all-encompassing as the plaintiffs would have desired. "In a first-party bad faith claim, 'an imperfect investigation, standing alone, is not sufficient cause for recovery if the insurer in fact has an objectively reasonable basis for denying the claim.'" [*Sampson*, 582 N.W.2d] at 152 (quoting *Reuter v. State Farm Mut. Auto. Ins. Co.*, 469 N.W.2d 250, 254–55 (Iowa 1991)). *In fact, where an insurer has an objectively reasonable basis to deny coverage, it has no duty to investigate further before denying the claim. See Morgan v. American Family Mut. Ins. Co.*, 534 N.W.2d 92, 98 (Iowa 1995).

*Seastrom*, 601 N.W.2d at 347 (emphasis added); *Sampson*, 582 N.W.2d at 149–50 ("when an objectively reasonable basis for denying a claim exists, the insurer as a matter of law cannot be held liable for bad faith"). Thus, an insurance company may reasonably decline to honor or settle a claim until it has had the chance to investigate the claim fully. *See Sampson*, 582 N.W.2d at 151 (citing *Dolan v. Aid Ins. Co.*, 431 N.W.2d 790, 794 (Iowa 1988)). Indeed, an insurer has a "right" to conduct an investigation concerning claims made by its insured, *see id.* (citing *Hoekstra v. Farm Bureau Mut. Ins. Co.*, 382 N.W.2d 100, 111 (Iowa 1986); *Pirkl*, 348 N.W.2d at 635; and *Amsden v. Grinnell Mut. Reins. Co.*, 203 N.W.2d 252, 255 (Iowa 1972)), but, under Iowa law, an insurer apparently has no "duty" to do so. *See Reuter*, 469 N.W.2d at 254 (quoting *Pirkl*, 348 N.W.2d at 633); *see also Seastrom*, 601 N.W.2d at 347 ("In fact, where an insurer has an objectively reasonable basis to deny coverage, it has no duty to investigate further before denying the claim.") (citing *Morgan*, 534 N.W.2d at 98).

With this understanding of a first-party bad faith claim under Iowa law, the court turns to the discovery issues arising from CFC's attempts to obtain material relevant to its bad faith counterclaim.

## B. Privilege Issues

### 1. Arguments of the parties

CFC contends that the London Insurers have tried to shield from discovery all documents from their claims investigation—which are plainly relevant to CFC's first-party bad faith counterclaim—by improperly asserting attorney-client and work product privileges. More specifically, CFC attacks the London Insurers' assertion of attorney-client privilege as to all documents reflecting communications between Mr. Schwartz, an attorney and President of Professional Claims Managers, Inc. (PCM), who conducted the claims investigation on behalf of the London Insurers, and any other party, and the London Insurers' assertion of work product privilege as to documents reflecting their alleged investigation of CFC's claim against the employment practices insurance policy. CFC contends that, although Mr. Schwartz is an attorney, the London Insurers cannot invoke the attorney-client or work product privileges as to any and all documents he generated or received when he was acting in the capacity of a claims investigator or adjuster, not as an attorney representing the London Insurers in anticipation of litigation. CFC also contends that the London Insurers had a duty to conduct an investigation of CFC's insurance claim, in the ordinary course of their business, and thus cannot assert either attorney-client or work product privilege as to documents generated in such an investigation prior to the date the London Insurers *attempted* to rescind the insurance policy and returned CFC's premium.

The London Insurers assert that they have made a good faith effort to produce all documents that are both relevant and non-privileged through the informal process the court demanded. The London Insurers, however, contend that all documents generated in regard to CFC's insurance claim after the Insurers *began to consider rescission* are privileged, and, moreover, that any documents after the date rescission was *decided upon* are irrelevant to CFC's bad faith claim, because the issue on such a bad faith claim is the Insurers' conduct before the insurance policy was rescinded. The London Insurers contend that Iowa courts have consistently

held that claims investigations conducted by insurers are conducted "in anticipation of litigation," and thus are afforded work product protection. The London Insurers contend further that CFC cannot satisfy the exception to work product protection, because CFC cannot establish its "substantial need" for the materials at issue in support of its bad faith claim, where this court has determined, in denying CFC's motion for summary judgment, that CFC had a duty to disclose the involuntary termination of various employees of Security State Bank when CFC acquired that bank. Apparently, the Insurers contend that this ruling establishes their "reasonable basis" for denying CFC's insurance claim and thus defeats CFC's bad faith counterclaim in this action. Thus, the London Insurers contend that CFC cannot prove any "substantial need" for the documents sufficient to overcome the qualified work product privilege adding that there is no such exception to the "absolute" attorney-client privilege.

In reply, CFC contends that federal law, not Iowa law, governs the scope of work product protection, even in this diversity case, and that the London Insurers have failed to meet their burden of proof to establish work product protection as to all of the documents it seeks. More specifically, CFC contends that the London Insurers have failed to establish that the documents in question were produced primarily in an effort to prepare for litigation, or with an identifiable resolve to litigate, rather than to fulfill their duty to investigate an insured's claim. CFC contends that there is a distinction between first-party and third-party bad faith claims, because the duty owed the insured in a first-party context distinguishes such cases from the nature of claims investigation in third-party cases, in which much, if not all, of the insurer's claims investigation can reasonably be considered to be "in anticipation of litigation," that is, litigation with a third party. CFC asserts that, on the basis of this distinction, courts have presumed that, in first-party cases, all investigation of an insured's claim conducted by an insurer before rescinding the policy or denying coverage is for the purpose of fulfilling a duty to investigate, not in anticipation of litigation, and

therefore is discoverable by the insured. CFC asserts that, even after the insurer denies coverage, the court should examine individual documents *in camera* to determine whether each document was produced because of an identifiable resolve to litigate. CFC contends that the London Insurers' purported "privilege log" falls woefully short of the requirements of the Federal Rules of Civil Procedure, leaving the court and CFC without a sufficient basis to determine the propriety of the assertions of privilege as to individual documents. As to attorney-client privilege, CFC reiterates that, as to most of the purportedly privileged documents, Mr. Schwartz was acting in his capacity as a claims adjuster and investigator, not as an attorney, so that no privilege attached. Finally, CFC contends that the London Insurers have failed to assert their privilege objections in a timely manner and that they have since waived their purported privileges by disclosing the substance of communications at issue and by asserting an "advice of counsel" defense to CFC's bad faith counterclaim.

### 2. *Applicable law and burden of proof*

In a diversity case, such as this one, courts "apply federal law to resolve work product claims and state law to resolve attorney-client privilege claims." *Baker v. General Motors Corp.*, 209 F.3d 1051, 1053 (8th Cir.2000) (citing *Simon v. G.D. Searle & Co.*, 816 F.2d 397 (8th Cir.), *cert. denied*, 484 U.S. 917, 108 S.Ct. 268, 98 L.Ed.2d 225 (1987)). In addition, even though this matter is before the court on CFC's motion to compel discovery responses, the London Insurers, as the parties asserting privilege as a bar to discovery, must carry the initial burden of proving a factual basis establishing the applicability of the privilege. *See, e.g., Rabushka v. Crane Co.*, 122 F.3d 559, 565 (8th Cir.1997) (finding the non-movant on a motion to compel met its burden to establish work product and attorney-client privileges), *cert. denied*, 523 U.S. 1040, 118 S.Ct. 1336, 140 L.Ed.2d 498 (1998); *In re Grand Jury Subpoena Duces Tecum*, 112 F.3d 910, 925 (8th Cir.) ("The White House bears the burden of proving the elements of work product immunity."), *cert. denied*, 521 U.S. 1105, 117

S.Ct. 2482, 138 L.Ed.2d 991 (1997). The party asserting the privilege "me[ets] its burden of providing a factual basis for asserting the privileges when it produce[s] a detailed privilege log stating the basis of the claimed privilege for each document in question, together with an accompanying explanatory affidavit of its ... counsel." *Id.* (citing *Zar v. South Dakota Bd. of Examiners of Psychologists,* 976 F.2d 459, 463–64 (8th Cir.1992)). Only if the London Insurers meet their burden to prove the materials in question are protected by the work product privilege will the burden shifts to CFC to prove "substantial need" and "undue hardship" to obtain those materials. FED. R. CIV. P. 26(b)(3). The attorney-client privilege, however, has no such "exception." *See generally Diversified Indus., Inc. v. Meredith,* 572 F.2d 596, 603–04 (8th Cir.1977) (distinguishing between the scope of work product and attorney-client privileges), *on rehearing,* 572 F.2d at 606 (8th Cir.1978) (*en banc* ).

### 3. Work product privilege

#### a. General principles

The federal work product doctrine was established in *Hickman v. Taylor,* 329 U.S. 495, 67 S.Ct. 385, 91 L.Ed. 451 (1947), and is now expressed in Federal Rule of Civil Procedure 26(b)(3). *Simon v. G.D. Searle & Co.,* 816 F.2d 397, 400 (8th Cir.), *cert. denied,* 484 U.S. 917, 108 S.Ct. 268, 98 L.Ed.2d 225 (1987); *see also Norton v. Caremark, Inc.,* 20 F.3d 330, 339 (8th Cir.1994) ("The work product doctrine is found in Federal Rule of Civil Procedure 26(b)(3)."). The Rule provides that documents "prepared in anticipation of litigation or for trial by or for another party or by or for that other party's representative" may be obtained in discovery "only upon a showing that the party seeking discovery has substantial need of the materials in the preparation of the party's case and that the party is unable without undue hardship to obtain the substantial equivalent of the materials by other means." FED. R. CIV. P. 26(b)(3). The Rule further provides that "the court shall protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of a party concerning the litigation." *Id.*

Consequently, there are two kinds of work product: ordinary work product and opinion work product. *See Baker,* 209 F.3d at 1054. The Eighth Circuit Court of Appeals has explained the difference between them as follows:

Ordinary work product includes raw factual information. *See Gundacker v. Unisys Corp.,* 151 F.3d 842, 848 n. 4 (8th Cir.1998). Opinion work product includes counsel's mental impressions, conclusions, opinions or legal theories. *See id.* at n. 5. Ordinary work product is not discoverable unless the party seeking discovery has a substantial need for the materials and the party cannot obtain the substantial equivalent of the materials by other means. *See* Fed. R.Civ.P. 26(b)(3). In contrast, opinion work product enjoys almost absolute immunity and can be discovered only in very rare and extraordinary circumstances, such as when the material demonstrates that an attorney engaged in illegal conduct or fraud. *See In re Murphy,* 560 F.2d 326, 336 (8th Cir.1977).

*Baker,* 209 F.3d at 1054. In *Baker,* the court also gave some examples of the kinds of materials to which the privilege applies:

Notes and memoranda of an attorney, or an attorney's agent, from a witness interview are opinion work product entitled to almost absolute immunity. *See In re Grand Jury Proceedings,* 473 F.2d 840, 848 (8th Cir.1973) (attorney's personal recollections, notes and memoranda from interviews are absolutely protected work product); *see also Upjohn Co. v. United States,* 449 U.S. 383, 399–400, 101 S.Ct. 677, 66 L.Ed.2d 584 (1981) ("[f]orcing an attorney to disclose notes and memoranda of witnesses' oral statements is particularly disfavored because it tends to reveal the attorney's mental processes"). Attorney notes reveal an attorney's legal conclusions because, when taking notes, an attorney often focuses on those facts that she deems legally significant. In this way, attorney notes are akin to an attorney's determination as to which documents are important to a case—the latter being something we

have also held to be protected work product. *See Petersen v. Douglas County Bank & Trust Co.*, 967 F.2d 1186, 1189 (8th Cir.1992)....

[I]f we were to assume the documents were ordinary work product, the [party seeking the documents must show] a substantial need for the documents and that the substantial equivalent of the information cannot be procured by other means. Discovery of a witness statement to an attorney is generally not allowed if that witness is available to the other party. *See In re Grand Jury Proceedings*, 473 F.2d at 849. A party also does not demonstrate substantial need when it merely seeks corroborative evidence. *See Director, Office of Thrift Supervision v. Vinson & Elkins, LLP*, 124 F.3d 1304, 1308 (D.C.Cir.1997) (no substantial need when documents sought would merely reinforce known inconsistencies).

*Baker*, 209 F.3d at 1054; *Gundacker v. Unisys Corp.*, 151 F.3d 842, 848 (8th Cir.1998), *cert. denied*, 525 U.S. 1070, 119 S.Ct. 801, 142 L.Ed.2d 662 (1999).

■ "The work product privilege operates to ensure that an opponent cannot secure materials that an adversary has prepared in anticipation of litigation." *Gundacker*, 151 F.3d at 848; *Pittman v. Frazer*, 129 F.3d 983, 988 (8th Cir.1997) ("The work product privilege is designed to promote the operation of the adversary system by ensuring that a party cannot obtain materials that his opponent has prepared in anticipation of litigation."); *see also Hickman*, 329 U.S. at 510–11, 67 S.Ct. 385 (the work product doctrine prevents "unwarranted inquiries into the files and mental impressions of an attorney," and recognizes that it is "essential that a lawyer work with a certain degree of privacy, free from unnecessary intrusion by opposing parties and their counsel"). Therefore, "[t]he work product doctrine sharply limits the access of an opponent to materials 'prepared in anticipation of litigation or for trial.'" *In re Grand Jury Subpoena Duces Tecum*, 112 F.3d 910, 924 (8th Cir.) (quoting FED. R. CIV. P. 26(b)(3), and also citing *Hickman*, 329 U.S. at 511, 67 S.Ct. 385), *cert. denied*, 521 U.S. 1105, 117 S.Ct. 2482, 138 L.Ed.2d 991 (1997). Although the doctrine has been applied in a variety of legal contexts, "[t]he essential element of each case ... is that the attorney was preparing for or anticipating some sort of adversarial proceeding involving his or her client." *Id.; Simon*, 816 F.2d at 401 ("The work product doctrine will not protect these documents from discovery unless they were prepared in anticipation of litigation.").

■ In *Simon*, the Eighth Circuit Court of Appeals laid out the test in this Circuit for determining whether documents were prepared "in anticipation of litigation" as follows:

Our determination of whether the documents were prepared in anticipation of litigation is clearly a factual determination:

[T]he test should be whether, in light of the nature of the document and the factual situation in the particular case, the document can fairly be said to have been prepared or obtained because of the prospect of litigation. But the converse of this is that even though litigation is already in prospect, there is no work product immunity for documents prepared in the regular course of business rather than for purposes of litigation.

8 C. Wright, A. Miller & R. Marcus, Federal Practice and Procedure § 2024, at 198–99 (1970) (footnotes omitted); *see Diversified Indus., Inc. v. Meredith*, 572 F.2d 596, 604 (8th Cir.1977), *on rehearing*, 572 F.2d at 606 (8th Cir.1978) (*en banc*); The Work Product Doctrine, 68 Cornell L.Rev. 760, 844–48 (1983). The advisory committee's notes to Rule 26(b)(3) affirm the validity of the Wright and Miller test: "Materials assembled in the ordinary course of business * * * * or for other nonlitigation purposes are not under the qualified immunity provided by this subdivision." Fed. R. Civ. P. 26(b)(3) advisory committee notes.

*Simon*, 816 F.2d at 401. Similarly, another panel of the court later wrote,

Under the work product doctrine, discovery of documents prepared in anticipation of litigation by or for another party or by or for that other party's attorney is restricted. Fed.R.Civ.P. 26(b)(3). Documents "prepared in anticipation of litiga-

tion" may include business records that were specifically selected and compiled by the other party or its representative in preparation for litigation and that the mere acknowledgment of their selection would reveal mental impressions concerning the potential litigation. *Shelton v. American Motors Corp.*, 805 F.2d 1323, 1329 (8th Cir.1986). Documents are not protected under the work product doctrine, however, merely because the other party transferred them to their attorney, litigation department, or insurer. *Id.* at 1328. Nor are documents protected that were assembled in the ordinary course of business or for other nonlitigation purposes. *Simon v. G.D. Searle & Co.*, 816 F.2d 397, 401 (8th Cir.1987) (citation omitted). *Petersen v. Douglas County Bank & Trust Co.*, 967 F.2d 1186, 1189 (8th Cir.1992). Finally, "[t]he work product doctrine is to be applied in a commonsense manner in light of reason and experience as determined on a case-by-case basis." *Pittman*, 129 F.3d at 988. A district court's determination that a document is privileged as attorney work product is reviewed for abuse of discretion. *Gundacker*, 151 F.3d at 848 (citing *Zar*, 976 F.2d at 463–64).

#### b. Insurance claims files

Numerous courts have noted the difficulty of determining the scope of work product privilege as it applies to insurance claims files or records from an insurer's investigation of an insured's claim, the precise issues upon which the discovery of the documents in this case hinges. *See, e.g., Goodyear Tire & Rubber Co. v. Chiles Power Supply, Inc.*, 190 F.R.D. 532, 535 (S.D.Ind.1999) (noting that, "[b]ecause an insurer's business is to investigate claims that may or may not result in litigation, application of the work product privilege to insurance claims investigations has been frequently litigated," and citing cases). The discussion below shows the difficulty.

*i.* ***Decisions within this Circuit.*** Although the Eighth Circuit Court of Appeals does not appear to have spoken on the precise issues presented here, it has addressed the applicability of the work product privilege to the products of similar "investigato-

ry" activities undertaken by attorneys in *Diversified Industries, Inc. v. Meredith*, 572 F.2d 596 (8th Cir.1977), *on rehearing*, 572 F.2d at 606 (8th Cir.1978) (*en banc*). In *Diversified Industries*, "the Board of Directors of Diversified concluded that it should cause an investigation to be made of the business practices of the company in the context of the disclosures that had been made in the course of litigation." *Diversified Indus., Inc.*, 572 F.2d at 600. The Board hired a law firm to conduct the investigation and report to the Board. *Id.* The court noted that the "Law Firm was not employed to give legal advice to Diversified and was not employed to represent Diversified in any pending or potential litigation. The reason for the employment of Law Firm was its supposed expertise in the relevant field." *Id.* The court considered the applicability of the work product privilege to two reports by the law firm and various corporate minutes. *Id.* at 601; *see also id.* (noting the applicability of the work product privilege is distinct from the applicability of the attorney-client privilege). The focus of the court's analysis of the work product issue, again, was whether the materials were prepared "in anticipation of litigation":

> From a reading of Rule 26(b)(3) and of the discussion of the work product rule appearing in 8 Wright, Miller & Marcus, *op. cit.*, §§ 2021–28, it is at once apparent that the qualified immunity or privilege accorded to "work product" by the rule is to some extent broader than the absolute attorney-client privilege that has been discussed. While the "work product" may be, and often is, that of an attorney, the concept of "work product" is not confined to information or materials gathered or assembled by a lawyer. Further, a communication may be immune from discovery as work product even though it was not made to or by a "client" of an attorney.

> However, the text of the rule makes it clear that the information or materials sought to be protected as "work product" must have been obtained "in anticipation of litigation or for trial." Otherwise, the privilege, often referred to as "qualified immunity" is not available.

With the foregoing in mind, we pass to a consideration of Diversified's claim of privilege with respect to the several documents that are in controversy here.

We have no difficulty in upholding the action of the district court in refusing to accord protection to Law Firm's memorandum of June 19, 1975. That memorandum contained no confidential information. It did little more than reveal the relationship between the parties, the purpose for which Law Firm had been engaged, and the steps which the Firm intended to take in discharging its obligation to Diversified. Such a document is not privileged. *See Colton v. United States,* 306 F.2d 633, 636 (2d Cir.1962), *cert. denied,* 371 U.S. 951, 83 S.Ct. 505, 9 L.Ed.2d 499 (1963); *Bailey v. Meister Brau, Inc.,* 55 F.R.D. 211, 214–15 (N.D.Ill.1972); 8 Wright, Miller & Marcus, *op. cit.,* p. 138.

The questions presented with respect to the December, 1975 report of Law Firm are more difficult. We have concluded, however, that the report is not entitled to protection on the basis of either attorney-client privilege or work product immunity.

\* \* \* \* \* \*

That the contents of the report constituted "work product" cannot be denied; nor is there any question that the report contained the mental impressions, conclusions and opinions of those who wrote it, including their interpretations of what the interviews with individuals revealed.

However, it is obvious that Law Firm's work was not done in preparation for any trial, and we do not think that the work was done in "anticipation of litigation," as that term is used in Rule 26(b)(3), although, of course, all parties concerned must have been aware that the conduct of employees of Diversified in years past might ultimately result in litigation of some sort in the future.

It may be conceded to Diversified that material may be assembled in "anticipation of litigation" even though no suit has actually been filed. However, the work product rule does not come into play merely because there is a remote prospect of future litigation. *Zenith Radio Corp. v. Radio Corp. of America, supra,* 121 F.Supp. at 795.

[Quotation omitted.]

Law Firm's investigation was not made and its report was not prepared because of any prospect of litigation involving Diversified. Law Firm was employed simply because the Board of Directors of Diversified wanted to know what actually had been going on and wanted to frame policies and procedures that in the future would protect it against repetitions of the prior misdeeds, if any, of its employees committed in the past.

*Diversified Indus., Inc.,* 572 F.2d at 603–04. On rehearing *en banc,* the court reaffirmed the conclusion that these materials were not prepared in anticipation of litigation, and thus were not entitled to protection under the work product privilege. *Id.* at 611 n. 4 (*en banc*).

One federal district court in this circuit, the United States District Court for the District of Minnesota, has twice attempted to determine the extent of work product protection for insurance or similar claims investigations. In *Mission National Insurance Co. v. Lilly,* 112 F.R.D. 160 (D.Minn.1986), the court encountered the question of the applicability of the work product privilege to materials from an insurance claim investigation by a law firm in the context of the defendant insured's counterclaim of first-party bad faith. *Mission Nat'l Ins. Co.,* 112 F.R.D. at 162. The court began its analysis of the work product issue with a discussion of the principles governing that privilege. *Id.* at 163. The court continued,

It is not the precepts of law that give rise to the difficulty in this case; instead, the difficulty exists because of plaintiffs decision, immediately upon receiving notice of the fire, to employ attorneys to fulfill its ordinary business function of claims investigation. Counsel for plaintiff agrees that Cozen & O'Connor was the only party responsible for performing that pure, ordinary business function. As it aptly points out, however, that singular function, at some point, came to be a concurrent one with the preparation of a legal stance in

the event of trial. Cozen & O'Connor, through the same personnel who performed the pure business function, also acted in the role of counsel. Not until this matter was filed was outside counsel called in. Based upon all the files and proceedings herein, as well as the documents submitted for in camera review, it is clear that this concurrent purpose continued until the filing of the lawsuit. It is also clear that litigation was in fact contemplated as of July 3, 1985. Some degree of pure claims investigation continued past that date.

No one other than plaintiff itself contributed to the difficult state of events arising from the concurrent role of Cozen & O'Connor. It would not be fair to allow the insurer's decision in this regard to create a blanket obstruction to discovery of its claims investigation. To the extent that Cozen & O'Connor acted as claims adjusters, then, their work-product, communications to client, and impressions about the facts will be treated herein as the ordinary business of plaintiff, outside the scope of the asserted privileges. This approach results in the majority of the file being discoverable. This approach is also well-supported legally.

*Mission Nat'l Ins. Co.*, 112 F.R.D. at 163. The court then noted that "[t]here appear to be three distinct approaches to the legal problem presented here." *Id.* at 164.

First is the approach urged by defendant and adopted in *Thomas Organ Co. v. Jadranska Slobodna Plovidba*, 54 F.R.D. 367 (N.D.Ill.1972), where protection is denied to insurance reports prepared after an accident that may generate a potential claim. That view operates out of the same concern referred to above, that the insurance business not be insulated from discovery. The second view results in a liberal grant of work-product and attorney-client protection to such items if they are produced in the wake of an accident likely to be litigated. *See Basinger v. Glacier Carriers, Inc.*, 107 F.R.D. 771, 773–74 (M.D.Pa.1985).

The most sound of the three views is that requiring a case-by-case analysis, considering the unique factual context of the given problem. This view rejects the hard-line approaches advocated by both plaintiff and defendant here, and has recently been favored for that very reason. *Basinger*, 107 F.R.D. at 774; *Tejada Fashions [Corp. v. Yasuda Fire & Marine Ins. Co.*, No. 83–5512, slip op., 1984 WL 500 (S.D.N.Y. June 18, 1984)]; *Carver v. Allstate Ins. Co.*, 94 F.R.D. 131 (S.D.Ga.1982); *Fine v. Bellefonte Underwriters Ins. Co.*, 91 F.R.D. 420 (S.D.N.Y.1981); *APL Corp. v. Aetna Casualty & Surety Co.*, 91 F.R.D. 10, 18 (D.Md.1980).

*Mission Nat'l Ins. Co.*, 112 F.R.D. at 165. The court concluded that the vast majority of the documents in question in the case before it that had been submitted under the claim of work product privilege constituted "pure factual investigation of the claim"—going to how the fire in question started and who was responsible for it—and that some of the investigation was required under the terms of the policy itself. *Id.* Moreover, "[b]ecause the documents of plaintiff include non-legal opinions and thoughts about the facts, as opposed to legal or trial matters, such 'mental processes' are properly treated as part of the ordinary business of the insurer," and were therefore discoverable. *Id.* Where the purposes of factual investigation and clear trial preparation overlapped later in the investigation, the court concluded that the discoverability of the materials turned on a different question, specifically, whether the party seeking the materials had established a substantial need to overcome the privilege. *Id.* As to "substantial need," the court concluded as follows:

Here, as in *APL Corp. v. Aetna*, defendant needs to know, in order to assert both its defense and counterclaim, what the insurer knew at the time of the claim denial. The issue being the state of the insurer's knowledge, it becomes apparent that plaintiff has all the relevant information under its control. For this compelling reason, then, the claim of work-product is overcome. *APL Corp.*, 91 F.R.D. at 14. Even if plaintiff were more persuasive in urging that defendant could determine from other sources what its insurer "should have known" at the time of the claim denial, there is a sufficient basis to conclude that

defendant does not have ready access to much of the primary source information. To recreate the arson investigation at this point would clearly constitute an undue hardship. Such reasons are adequate for overruling an assertion of the work-product doctrine. *In re Murphy*, 560 F.2d at 334.

*Mission Nat'l Ins. Co.*, 112 F.R.D. at 164. Therefore, the court ordered production of the investigation materials with redaction, where necessary, to remove disclosures of the mental processes and opinions of counsel that truly bore on the "anticipated, choate litigation." *Id.*

The United States District Court for the District of Minnesota again encountered similar issues in *Marvin Lumber & Cedar Co. v. PPG Indus., Inc.*, 168 F.R.D. 641 (D.Minn. 1996), where it addressed the question of the scope of work product protection for the plaintiffs' investigation of a wood rot problem centering on products in which the plaintiff had utilized a preservative made by the defendant. *See Marvin Lumber & Cedar Co.*, 168 F.R.D. at 643. Some of the plaintiffs' customers, who had received allegedly defective products subject to wood rot, were threatening litigation. *Id.* In *Marvin Lumber*, after noting that the critical issues for the applicability of the privilege is whether the materials at issue were prepared in anticipation of litigation, and stating this Circuit's test from *Simon*, the court added, "Where the work product of the attorneys is intertwined between prospective litigation and non-litigation business purposes, the work product doctrine should properly attach." *Id.* at 645 (citing *Diversified Indus., Inc.*, 572 F.2d at 610). The court's resolution of the privilege issue, however, specifically relied on the reasoning in *Mission National Insurance* concerning the applicability of the privilege to an insurer's investigation of a claim:

> The parties' principal dispute centers upon the role that was played by legal counsel in the Plaintiffs' investigation of the wood rot problem. In this regard, we find the reasoning of the Court, in *Mission Nat'l. Ins. Co. v. Lilly*, 112 F.R.D. 160 (D.Minn.1986), to be persuasive. There, an insurer sued its insured for a determination of liability and, after the insured had submitted a policy claim, the insurer retained a law firm to conduct and oversee an investigation of the insured's claim. Despite the fact that counsel performed that investigation, the Court rejected the insurer's claim of "work product" protection, by reasoning that the mere involvement of an attorney, in the ordinary business activities of a party, cannot legitimately shield those activities from discovery. Under such circumstances, the Court felt that it would be distinctly unfair to allow the insurer's decision, to subcontract its decisionmaking to a third-party law firm, "to create a blanket obstruction to discovery of its claims investigation." *Id.* at 163. We think the very same may be said here and, as a consequence, the Plaintiffs may not shield their investigation of the cause of the alleged wood rot merely because they elected to delegate their ordinary business obligations to legal counsel.

*Marvin Lumber & Cedar Co.*, 168 F.R.D. at 646. The court also considered the plaintiffs' attempt to evade *Mission National Insurance*:

> Rather than distinguish the Court's holding in *Mission*, counsel for the Plaintiffs had advised that the Defendant has simply asked the "wrong questions." Specifically, the Plaintiffs contend that the Defendant's inquiries have been wholly restricted to exploring which was communicated by the Plaintiffs to their legal counsel or vice versa. Of course, under the rule expressed in *In re Bieter Co.*, 16 F.3d 929, 940–41 (8th Cir.1994), such communications are privileged even though the facts, that are contained in the communications, are not. Further, while historical facts are not privileged, when those facts are collated or categorized by legal counsel they may well be entitled to protection from disclosure under the work product doctrine. *See, e.g., Shelton v. American Motors Corp.*, [805 F.2d 1323,] 1326 [(8th Cir.1986)] (selective review of numerous documents reflects counsel's legal theories and thought processes, which are protected as work product). Nevertheless, as our Court of Appeals has repeatedly recog-

nized, "[d]ocuments are not privileged under the work product doctrine \* \* \* merely because the other party transferred them to their attorney, litigation department, or insurer." *Petersen v. Douglas County Bank & Trust Co.,* [967 F.2d 1186,] 1189 [(8th Cir.1992)], citing *Shelton v. American Motors Corp., supra.* Therefore, while the Plaintiffs may lawfully assert a privilege as to a chart or other compilation of facts, that was specifically generated to respond to a specific request from legal counsel, the Plaintiffs may not generally assert a blanket privilege as to those facts that were generated by its investigation merely because those facts were subsequently incorporated into a communication to counsel.

*Marvin Lumber & Cedar Co.,* 168 F.R.D. at 646. The court in *Marvin Lumber* directed discovery to proceed consistent with these principles. *Id.*

***ii. Other courts.*** Although the court finds that adequate guidance is provided by decisions from within this Circuit, in light of the complexity of the issues presented here, the court will also consider decisions from other courts. That consideration, however, is not meant to be exhaustive; rather, it is intended to develop further applicable principles for resolution of the work product privilege issue in this case.

In the insurance context, several courts have rejected the notion that every statement taken by a defendant's insurance adjustor or every document generated in the course of investigation of an insurance claim is necessarily prepared in anticipation of litigation; instead, these courts, like the Eighth Circuit Court of Appeals in *Simon,* 816 F.2d at 401, have attempted to distinguish documents and statements that truly were prepared in anticipation of litigation from those prepared in the ordinary course of business or for other non-litigation purposes, rejecting the application of work product privilege to materials of the latter kind. *See, e.g., Holton*

*v. S & W Marine, Inc.,* 2000 WL 1693667 (E.D.La. Nov.9, 2000); *United States Fidelity & Guaranty Co. v. Braspetro Oil Servs. Co.,* 2000 WL 744369, \*9 (S.D.N.Y. June 8, 2000); *Disidore v. Mail Contractors of Am., Inc.,* 196 F.R.D. 410, 413–14 (D.Kan.2000).

For example, the court in *Holton* made the following pertinent observations concerning collection of witness statements: ·

> Insurance companies regularly take statements from witnesses during the routine adjustment of a potential insurance claim. The collection of [a witness's] statement during the ordinary course of business need not raise the protections afforded to attorney workproduct despite defendants' claim that prudent parties anticipate litigation and act with that possibility in mind. *Defendants' assertions cannot protect the witness's statement from discovery absent a showing that their investigations were conducted primarily for the purposes of future litigation and outside the ordinary course of investigating a potential insurance claim.*

*Holton,* 2000 WL 1693667 at \*3 (emphasis added).[1]

Similarly, the court in *Piatkowski v. Abdon Callais Offshore, L.L.C.,* 2000 WL 1145825 (E.D.La. Aug.11, 2000), also focused on the question of whether the insurer's materials were assembled in anticipation of litigation or in the ordinary course of the insurer's business:

> [C]ourts have routinely recognized that the investigation and evaluation of claims is part of the regular, ordinary, and principal business of insurance companies. Thus, even though litigation is pending or may eventually ensue does not cloak such routinely generated documents with work product protection. *See Amak Food Corp. v. The Travelers Co.,* No. 80–5753, slip op. at 2 (S.D.N.Y. April 27, 1981); *Atlanta Coca–Cola Bottling, Co. v. Transamerica Ins. Co.,* 61 F.R.D. 115, 118 (N.D.Ga.1972).

---

1. Even if the statement in question in *Holton* qualified as privileged work product, the court found that the privilege had been defeated, because the party seeking the statement had demonstrated both the substantial need and undue hardship necessary for discovery of work product under Rule 26(b)(3). *Holton,* 2000 WL 1693667 at \*3. This was so, because the statement had been taken close in time to the event from which the claim arose, and the witness and the claimant were the only two witnesses to the accident. *Id.*

*Piatkowski,* 2000 WL 1145825 at *2. In the absence of any information indicating that the party claiming the privilege performed services that were different from an insurer's business of investigating and adjusting claims and resolving disputes short of litigation, the court found that the party asserting the privilege had failed to carry its burden to establish work product protection. *Id.* at *3. *See also Disidore,* 196 F.R.D. at 414 (although the insurance company hired an attorney to conduct its claims investigation, it failed to present adequate evidence showing the attorney was hired "in anticipation of litigation" where the evidence failed to show a purpose other than routine claims investigation and failed otherwise to shed any light on whether the discussions and notes in question took place in anticipation of a lawsuit being filed).

In *Braspetro Oil Servs. Co.,* the United States District Court for the Southern District of New York noted that "[c]ourts have observed that the application of the work product doctrine to documents prepared by insurance companies during claims investigations is difficult because '[t]he nature of the insurance business is such that an insurance company must investigate a claim prior to determining whether to pay its insured,' and thus pre-litigation investigation is the routine business of insurance companies.'" *Braspetro Oil Servs. Co.,* 2000 WL 744369 at *9 (quoting *Westhemeco Ltd. v. New Hampshire Ins. Co.,* 82 F.R.D. 702, 708 (S.D.N.Y. 1979)). The court added that, "[a]lthough at some point, a company's investigation may shift from the ordinary course of business to an anticipation of litigation, there is no hard and fast rule as to when this occurs; rather, a fact-specific inquiry is required to determine when this shift occurs." *Id.* Therefore, the court considered factors including the retention of an attorney, although hiring an attorney should not necessarily insulate an insurance company behind work product privilege; whether the parties were still jointly exploring ways to resolve their differences; whether either party had declared a definite position or both were still considering their positions; whether, once a position was declared, what was done would have been done for business purposes, regardless

of the possibility of litigation; and what the parties' routine business practice of investigation was. *Id.* at *10–*12; *see also Kidwiler v. Progressive Paloverde Ins. Co.,* 192 F.R.D. 536, 542 (N.D.W.Va.2000) (also advocating consideration of various factors, including the nature of the documents, the nature of the litigation, the relationship between the parties, and any other fact peculiar to the case, such as the involvement of counsel and the time when the document was created, and noting that, even after "anticipation of litigation" was established on the date that one party informed the other that it had violated state law, all documents created after that date were *not* necessarily prepared in anticipation of litigation, because that determination also depended upon the "nature of the specific document" and whether it was created under the anticipation of litigation); *and compare Goodyear Tire & Rubber Co.,* 190 F.R.D. at 536–37 (the insurer had made the required showing of work product protection where it showed that it anticipated litigation when its lawyers and investigators obtained witness statements indicating a product defect, and the insurer presented "specific facts" indicating that the statements were taken to prepare for that litigation).

Some courts have found a distinction between first-party and third-party bad faith cases to be important to the scope of work product protection for the insurer's investigation, as CFC contends. *See, e.g., Goodyear Tire & Rubber Co.,* 190 F.R.D. at 537–38 (discussing this distinction as "important"); *Weitzman v. Blazing Pedals, Inc.,* 151 F.R.D. 125, 126 (D.Colo.1993); *Harper v. Auto–Owners Ins. Co.,* 138 F.R.D. 655, 662 (S.D.Ind.1991). These cases often rely on a "duty" of the insurer to investigate in first-party bad faith cases, which they reason warrants the conclusion that such investigations were not "in anticipation of litigation," but for the ordinary business purpose of fulfilling the investigatory duty. While the court is itself persuaded that such a distinction has merit, an argument based on the distinction appears to be at least partially foreclosed in the context of a first-party bad faith claim under Iowa law, because the Iowa

Supreme Court does not recognize a fiduciary or other specific duty of the insurer to conduct an investigation in first-party bad faith cases. *See, e.g., Seastrom,* 601 N.W.2d at 347; *Morgan,* 534 N.W.2d at 98; *Reuter,* 469 N.W.2d at 254–55; *Pirkl,* 348 N.W.2d at 633. Nevertheless, even these Iowa decisions suggest a difference between the absence of any duty to investigate the *factual basis* for a claim and the extent of the duty to investigate the availability of *coverage.* Thus, in *Pirkl,* the court wrote, "[T]he insurer has no clearly defined duty to investigate *and may require the insured to present adequate proof of loss before paying the claim,"* *Pirkl,* 348 N.W.2d at 633 (emphasis added), while in *Seastrom,* the court wrote, "where an insurer has an objectively reasonable basis *to deny coverage,* it has no duty to investigate *further* before denying the claim." *Seastrom,* 601 N.W.2d at 347 (emphasis added). As the court reads these cases, an insurer has no duty to investigate a claim until the insured presents proof of the *fact* of loss, but upon proper presentation of proof of loss, an insurer must investigate the *legal* question of whether the loss falls within the *coverage* of the policy or whether *coverage* is otherwise not available, for example, owing to misrepresentations or non-disclosures by the insured in the application for insurance. As the Iowa Supreme Court recognized, the insurer's "reasonable basis" to deny a claim "may involve a dispute concerning an issue of fact or law." *Seastrom,* 601 N.W.2d at 346–47; *Sampson,* 582 N.W.2d at 150. Therefore, this court concludes that, even under Iowa law defining first-party bad faith, an insurer's investigation of whether *coverage* exists is required and the conduct of that much of its investigation is assuredly in the ordinary course of its business, not "in anticipation of litigation." *Cf. Seastrom,* 601 N.W.2d at 347.

### c. *Applicability of the work product privilege*

■ First, the court rejects any assertion that, merely because Mr. Schwartz, the person who conducted the claims investigation on behalf of the London Insurers, was an attorney, all of the products of his investigation are necessarily protected by the work product privilege. An insurer cannot shield its entire· claims investigation behind the work product privilege simply by hiring an attorney to perform what is in the ordinary course of the insurer's business. *See Mission Nat'l Ins. Co.,* 112 F.R.D. at 163; *Disidore,* 196 F.R.D. at 414; *see also Petersen,* 967 F.2d at 1189 ("Documents are not protected under the work product doctrine, however, merely because the other party transferred them to their attorney, litigation department, or insurer. Nor are documents protected that were assembled in the ordinary course of business or for other nonlitigation purposes.") (internal citations omitted); *Diversified Indus., Inc.,* 572 F.2d at 603–04 (materials from a company's internal investigation were not protected by work product privilege, even though the investigation was conducted by a law firm, where the investigation was primarily for internal business purposes); *Marvin Lumber & Cedar Co.,* 168 F.R.D. at 646 (like the court in *Mission Nat'l Ins.,* rejecting the contention that, merely because counsel performed an investigation, the products of the investigation were shielded by work product privilege). As courts have repeatedly recognized, it is the insurer's "ordinary business" to investigate claims, whether or not that investigation is likely to result in litigation. *See, e.g., Piatkowski,* 2000 WL 1145825 at *2 ("[C]ourts have routinely recognized that the investigation and evaluation of claims is part of the regular, ordinary, and principal business of insurance companies"); *Goodyear Tire & Rubber Co.,* 190 F.R.D. at 535 ("an insurer's business is to investigate claims that may or may not result in litigation").

■ Obviously, then, the critical question here, as in all cases in which work product issues arise, is whether the materials the London Insurers seek to shield behind the work product privilege were prepared "in anticipation of litigation." FED. R. CIV. P. 26(b)(3); *Gundacker,* 151 F.3d at 848; *Pittman,* 129 F.3d at 988; *In re Grand Jury Subpoena Duces Tecum,* 112 F.3d at 924; *Petersen,* 967 F.2d at 1189; *Simon,* 816 F.2d at 401; *Diversified Indus., Inc.,* 572 F.2d at 603–04 (investigation materials); *Marvin Lumber & Cedar Co.,* 168 F.R.D. at 646

(investigation materials); *Mission Nat'l Ins. Co.*, 112 F.R.D. at 163 (insurance claim investigation materials); *accord Holton*, 2000 WL 1693667 at *3 (insurance claim investigation materials); *Piatkowski*, 2000 WL 1145825 at *2; *Braspetro Oil Servs. Co.*, 2000 WL 744369 at *9; *Disidore*, 196 F.R.D. at 414 (insurance claim investigation materials); *Kidwiler*, 192 F.R.D. at 542; *Goodyear Tire & Rubber Co.*, 190 F.R.D. at 536–37 (insurance claim investigation materials). The parties agree that, at some point, the London Insurers' investigation changed from one in the ordinary course of an insurer's business, that is, an investigation merely to determine coverage, into one in anticipation of litigation. *See, e.g., Mission Nat'l Ins. Co.*, 112 F.R.D. at 163 (attempting to determine at what point in the investigation ordinary business and anticipation of litigation became "concurrent"); *accord Braspetro Oil Servs. Co.*, 2000 WL 744369 at *9 (recognizing that, at some point, an insurance company's investigation may shift from ordinary course of business to an anticipation of litigation). Unfortunately, they disagree on when that point was reached in the investigation of CFC's claim against the employment practices insurance policy. The London Insurers contend that the transition point was reached as soon as they *began to consider rescission,* while CFC contends that the transition point was not reached until the London Insurers actually *attempted to rescind* the policy.

■ The court is not persuaded by the London Insurers' argument. Under this Circuit's test of when parties "anticipate litigation," the court must examine the "factual situation" and the "nature of the documents" to determine whether documents can "fairly be said to have been prepared or obtained because of the prospect of litigation," but "even though litigation is already in prospect, there is no work product immunity for documents prepared in the regular course of business rather than for purposes of litigation." *See Simon,* 816 F.2d at 401. Even when the London Insurers, and specifically their agent, Mr. Schwartz, *began to consider rescission* on the basis of CFC's failure to disclose the October 1999 terminations, that consideration was part of the investigation of the availability of *coverage* for the employment discrimi-

nation claims against CFC, and hence still part of the routine business of insurance claims investigation. *See Seastrom,* 601 N.W.2d at 347 ("where an insurer has an objectively reasonable basis *to deny coverage,* it has no duty to investigate *further* before denying the claim") (emphasis added). Even where the parties concerned "must have been aware" that the circumstances "might ultimately result in litigation," the requirement that the materials were prepared "in anticipation of litigation" is not met, if the documents were in fact prepared to fulfill a non-litigation purpose. *See Diversified Indus., Inc.,* 572 F.2d at 604.

■ Also, even after a determination to litigate has been reached, some documents may still fall outside work product protection if the primary purpose for preparing specific documents is "pure claims investigation." *See Mission Nat'l Ins. Co.,* 112 F.R.D. at 163. This court agrees with the court in *Mission National Insurance* that "[i]t would not be fair to allow the insurer's decision [to conduct a 'concurrent investigation' through an attorney] to create a blanket obstruction to discovery of its claims investigation." *Id.* Thus, to the extent that the documents in question show only that the London Insurers or their agents, including Mr. Schwartz, were investigating whether the *factual basis* existed for rescinding coverage under the policy, the documents are not shielded by the work product privilege, as the coverage determination does not equate with a determination to litigate, but is instead part of the ordinary course of an insurer's business to determine coverage. The court finds that documents at this stage of the investigation are not protected, even if they include mental impressions, conclusions, and opinions of Mr. Schwartz regarding the availability of coverage, because these impressions, conclusions, and opinions are part of the pure investigation and evaluation of coverage, not part of preparation for or anticipation of litigation. *See Diversified Indus., Inc.,* 572 F.2d at 603–04. Therefore, even if the London Insurers believed that litigation would be required to accomplish a rescission, they did not "anticipate litigation" within the meaning of Rule 26(b)(3) just because they began to consider

rescission while they were still making a coverage determination. *See Piatkowski*, 2000 WL 1145825 at *2 ("[C]ourts have routinely recognized that the investigation and evaluation of claims is part of the regular, ordinary, and principal business of insurance companies" and "even though litigation is pending or may eventually ensue does not cloak such routinely generated documents with work product protection.").

Here, the exhibits submitted by the parties show that the London Insurers' investigating agents may have *considered* rescission of the policy, on the ground of non-disclosure of material information, as early as (or earlier than) April 12, 2000, when that possibility was raised in a letter from Mr. Schwartz, in his capacity as President of PCM, *i.e.*, his capacity as a claims investigator and adjuster for the London Insurers, to Mr. Brown, President of CFC. *See* CFC's Memorandum of Law Regarding Attorney Client Privilege and Work Product Protection, Exhibit 3. The London Insurers did not attempt to rescind the policy until June 13, 2000, when they notified CFC of their decision to rescind the policy, again through a letter from Mr. Schwartz to Mr. Brown, and returned the premium paid by CFC. *See* CFC's Memorandum of Law Regarding Attorney Client Privilege and Work Product Protection, Exhibit 2. No work product privilege attaches to any materials in the London Insurers' investigation or claims files prior to June 13, 2000. This conclusion is not only in accord with decisions from this Circuit, as explained above, but with the factors identified by other courts for determining at what point a "shift" occurs in an insurer's investigation from investigation in the ordinary course of the insurer's business to preparation for or anticipation of litigation. *See, e.g., Braspetro Oil Servs. Co.*, 2000 WL 744369 at *10–*12; *Kidwiler*, 192 F.R.D. at 542. These decisions indicate that, until the investigating party determines on a course of action, no work product protection attaches, and that, even after the parties "stake out" their positions, they do not necessarily "anticipate litigation" if they continue to explore amicable resolution and/or the documents in question were still collected in the ordinary course of business. *See id.; Kidwiler*, 192 F.R.D. at 542.

To put it another way, the London Insurers have failed to demonstrate, through a demonstration of "specific facts," that, prior to June 13, 2000, anything about their investigation differed from an ordinary "coverage" investigation and negotiation with an insured. *Compare Goodyear Tire & Rubber Co.*, 190 F.R.D. at 536–37 (the insurer made the required showing to sustain work product protection where it showed, from "specific facts," that it anticipated litigation and its lawyers and investigators obtained witness statements to prepare for that litigation). Such materials are not protected by work product privilege, even though the London Insurers had engaged outside counsel, David Paige, prior to June 13, 2000, because the hiring of outside counsel does not, by itself, indicate a determination to litigate, and the record presented thus far indicates that coverage evaluation—*i.e.*, claims investigation in the ordinary course of business—continued after Mr. Paige was hired until the London Insurers declared that they had rescinded the insurance policy in question. *See Braspetro Oil Servs. Co.*, 2000 WL 744369 at *10–*12; *Kidwiler*, 192 F.R.D. at 542.

■ In the alternative, assuming that all documents generated in the London Insurers' investigation prior to June 13, 2000, *were* work product, they constituted "ordinary" work product and are thus discoverable upon a showing of "substantial need" and "undue hardship." FED. R. CIV. P. 26(b)(3). This is so, notwithstanding that "coverage" is in some sense a legal determination—necessarily involving the investigator's conclusions and opinions—or a mixed legal and factual determination that differs from "raw factual determinations," such as proof of loss. *See Baker*, 209 F.3d at 1054 (distinguishing between "ordinary" and "opinion" work product, on the ground that the former involves only "raw factual information," while the latter involves mental impressions, conclusions, opinions, or legal theories). Here, the court concludes, the unique nature of an insurance claim investigation in the context of a first-party bad faith claim determines the "ordinary" nature of the work product as well as the discovering party's "need": In an insurance claim investigation, "raw factual information," such

as the alleged non-disclosure in this case, leads to a "coverage" determination, and the question in a case involving a first-party bad faith claim is not just what an insurer knew when, but when the insurer made the connection between certain facts and its determination to deny "coverage" on some purportedly "reasonable basis." *Seastrom,* 601 N.W.2d at 347 ("where an insurer has an objectively reasonable basis *to deny coverage,* it has no duty to investigate *further* before denying the claim") (emphasis added). The court in *Mission National Insurance* reached a similar conclusion, holding that, "[t]o the extent that Cozen & O'Connor acted as claims adjusters, then, their work-product, communications to client, and impressions about the facts will be treated herein as the ordinary business of plaintiff, outside the scope of the asserted privileges." *Mission Nat'l Ins. Co.,* 112 F.R.D. at 163.

As in *Mission National Insurance,* "[t]his approach results in the majority of the file being discoverable," because CFC can make the necessary showing of "need" and "hardship" to discover such "ordinary" work product under Rule 26(b)(3). *Id.* Both the timing of, and the determination of a basis for, the denial of "coverage" are essential facts in a first-party bad faith case. As the court in *Mission National Insurance* more ably explained the point,

> Here, as in *APL Corp. v. Aetna,* defendant needs to know, in order to assert both its defense and counterclaim, what the insurer knew at the time of the claim denial. The issue being the state of the insurer's knowledge, it becomes apparent that plaintiff has all the relevant information under its control. For this compelling reason, then, the claim of work-product is overcome. *APL Corp.,* 91 F.R.D. at 14. Even if plaintiff were more persuasive in urging that defendant could determine from other sources what its insurer "should have known" at the time of the claim denial, there is a sufficient basis to conclude that defendant does not have ready access to much of the primary source information.

*Mission Nat'l Ins. Co.,* 112 F.R.D. at 164. Nor does CFC have any reasonable means to obtain the necessary information from any other source without undue hardship. *See id.* Therefore, work product privilege notwithstanding, the London Insurers must produce all materials from their claims file generated prior to June 13, 2000.

#### d. Waiver

■ CFC also contends that the London Insurers have waived any work product privilege, before and after June 13, 2000, through disclosure and inadequate assertion of the privilege in an inadequate or untimely privilege log. "Although disclosure to an adversary ordinarily waives work product protection, there must be an intention that the opposing party see the work product." *Gundacker,* 151 F.3d at 848. The scope of the waiver depends upon the scope of the disclosure:

> We have stated that disclosure to an adversary waives work product protection as to items actually disclosed. *In re Chrysler Motors Corp. Overnight Evaluation Program Litig.,* 860 F.2d 844, 846 (8th Cir.1988).

> If documents otherwise protected by the work-product rule have been disclosed to others with an actual intention that an opposing party may see the documents, the party who made the disclosure should not subsequently be able to claim protection for the documents as work product. But disclosure of some documents does not destroy workproduct protection for other documents of the same character.

Wright, Miller & Marcus, § 2024 at 209 (emphasis added); *see also Duplan Corp. v. Deering Milliken, Inc.,* 540 F.2d 1215, 1222 (4th Cir.1976) ("broad concepts of subject matter waiver analogous to those applicable to claims of attorney-client privilege are inappropriate when applied to Rule 26(b)(3)"); *In re United Mine Workers of America Employee Benefit Plans Litig.,* 159 F.R.D. 307, 310–12 (D.D.C.1994) (production of documents protected by attorney work product doctrine resulted in waiver of privilege only as to those documents produced).

*Pittman,* 129 F.3d at 988.

■ The court agrees that the London Insurers have "waived" work product pro-

tection for any documents that were sent to Mr. Brown or other agents of CFC, any documents that are of record in this lawsuit, and any documents that relate to discovery in this lawsuit. *See Gundacker*, 151 F.3d at 848 (waiver requires both disclosure to an adverse party and intention that the adverse party see the work product). Indeed, the court finds that assertion of work product privilege is patently bizarre as to several items the London Insurers have marked "work product" or "material prepared in anticipation of litigation" in their "Privilege Logs," and have therefore refused to produce, including the June 13, 2000, letter from Mr. Schwartz to Mr. Brown of CFC; the June 11, 2000, letter from Mr. Reck, counsel for CFC, to Mr. Schwartz; the June 19, 2000, letter from Mr. Reck, counsel for CFC, to Mr. Schwartz; the July 19, 2000, Notice, Summons & Complaint; the July 31, 2000, correspondence from David H. Paige, an attorney for the London Insurers, to Mr. Reck, counsel for CFC; the undated "Notice of Availability of Magistrate Judge To Exercise Jurisdiction & Appeal Option"; the undated "Form Order Requiring Submission of Scheduling Order"; the September 5, 2000, Summons, Answer & Counterclaim; and any other items filed in this case or any discovery requests or responses exchanged between the parties. *See* CFC's Memorandum of Law Regarding Attorney Client Privilege and Work Product Protection, Exhibit 1 (Privilege Log: Plaintiff's Document Production, November 10, 2000); *see also* The London Insurers' Memorandum of Law in Opposition To Defendant's Motion to Compel, Exhibit Q (Privilege Log: Plaintiff's Document Production, November 30, 2000).

■ Waiver may also occur when a party fails to assert the privilege properly. *See Disidore v. Mail Contractors of Am., Inc.*, 196 F.R.D. 410, 413 (D.Kan.2000); *see also Rabushka v. Crane Co.*, 122 F.3d 559, 565 (8th Cir.1997) (the non-movant on a motion to compel "me[ets] its burden of providing a factual basis for asserting the privileges when it produce[s] a detailed privilege log stating the basis of the claimed privilege for each document in question, together with an accompanying explanatory affidavit of its ... counsel.") (citing *Zar v. South Dakota Bd. of Examiners of Psychologists*, 976 F.2d 459, 463–64 (8th Cir.1992)), *cert. denied*, 523 U.S. 1040, 118 S.Ct. 1336 (1998). In *Disidore*, the court concluded that a "blanket claim" or "conclusory assertion" as to the applicability of the work product doctrine does not satisfy the privilege claimant's burden of proof, and that "[a] party's failure to meet [its] burden when the trial court is asked to rule upon the existence of the work product immunity is not excused because the document is later shown to be one that would have been privileged if a timely showing had been made." *Disidore*, 196 F.R.D. at 413 (citing *Peat Marwick, Mitchell & Co. v. West*, 748 F.2d 540, 542 (10th Cir.1984), and *McCoo v. Denny's, Inc.*, 192 F.R.D. 675, 680 (D.Kan.2000)).

■ CFC argues that discovery responses were due, pursuant to the October 10, 2000, order of a magistrate judge in this case, on or before October 31, 2000. The insurers had provided only "boilerplate" assertions of privilege on September 30, 2000, and, despite this court's order imposing sanctions dated November 22, 2000, the Insurers have *never* supplemented their responses. Indeed, the court finds that the London Insurers did not even comply with the magistrate judge's discovery deadline, because the London Insurers' responses were not dated or returned prior to the deadline. Instead, the London Insurers' own statement of the course of discovery indicates that they did not provide materials from U.S. Risk's underwriting file until November 3, 2000, and only produced other discovery responses later in November.

■ Certainly, neither the "Privilege Log: Plaintiff's Document Production," dated November 10, 2000, CFC's Exhibit 1, nor the "Privilege Log: Plaintiff's Document Production," dated November 30, 2000, which appears as the London Insurers' Exhibit Q, asserts work product privilege in a timely or adequate manner. Neither "Privilege Log" is by any means a "detailed" or adequate statement of the "factual basis for asserting the privileges," and there is no "accompanying explanatory affidavit of [the London Insurer's]... counsel" supporting the assertion of privilege as to each document. *See Ra-*

*bushka,* 122 F.3d at 565. The London Insurers cannot place upon the court the burden of examining the propriety of their assertions of privilege in an *in camera* inspection of documents, as they request in their letter to the court of December 11, 2000, with which they submitted documents for the court's eyes only, where they have never properly asserted the privilege. Such an attempt to invoke an *in camera* inspection to determine whether documents are privileged is ineffective, because "[a] party's failure to meet [its] burden when the trial court is asked to rule upon the existence of the work product immunity is not excused because the document is later shown to be one that would have been privileged if a timely showing had been made." *Disidore,* 196 F.R.D. at 413. The court's sanction order of November 22, 2000, and December 1, 2000, order concerning resolution of discovery disputes did not, and were not intended, to excuse the London Insurers from properly asserting privilege, even though those orders directed the parties to attempt to resolve their discovery disputes in a reasonable and informal manner; rather, the parties were to attempt informal resolution of their disputes involving materials as to which privilege had been timely and effectively asserted.

Consequently, the court concludes that the London Insurers have waived work product privilege as to any of the documents identified in either their November 10, 2000, or November 30, 2000, "Privilege Logs" by failing to assert privilege in a timely and effective manner.

### 4. *Attorney-client privilege*

Although the court concludes that the London Insurers have also waived any attorney-client privilege by inadequately asserting the privilege, *see Rabushka,* 122 F.3d at 565 (stating the requirements to assert either attorney-client or work product privilege), in the alternative, the court concludes that it should determine the scope of any attorney-client privilege that could *properly* have been asserted. As mentioned above, while the scope of work product privilege is a question of federal law, the scope of attorney-client

privilege is a question of state law. *Baker,* 209 F.3d at 1053.

"Under Iowa common law, '[a]ny confidential communication between an attorney and the attorney's client is absolutely privileged from disclosure against the will of the client.'" *Squealer Feeds v. Pickering,* 530 N.W.2d 678, 684 (Iowa 1995) (quoting *Shook v. City of Davenport,* 497 N.W.2d 883, 886 (Iowa 1993)). Similarly, IOWA CODE § 622.10, which codifies the privilege, provides that the privilege applies to "[a] practicing attorney ... who obtains information by reason of the person's employment" and prohibits that "practicing attorney" from disclosing "any confidential communication properly entrusted to the person in the person's professional capacity, and necessary and proper to enable the person to discharge the functions of the person's office according to the usual course of practice or discipline." The clear implication of both Iowa common-law and Iowa's statutory embodiments of the privilege is that it applies only to communications between an attorney and a client in the context of a professional relationship involving the attorney *as an attorney.* Hence, for many of the same reasons work product privilege does not attach to materials generated by or provided to Mr. Schwartz, because Mr. Schwartz was acting in his capacity as a claims investigator or claims adjustor, not as an attorney, and such materials were generated in the ordinary course of the London Insurers' business of claims investigation, no attorney-client privilege attaches either.

This conclusion is in accord with decisions from this Circuit directly addressing the applicability of attorney-client privilege to attorneys acting in an investigatory rather than legal capacity. In *Diversified Industries,* the Eighth Circuit Court of Appeals considered the effect of the attorney's status as an investigator upon assertion of attorney-client privilege, as follows:

We find it unnecessary to decide whether the persons interviewed by the Firm's representatives should be considered as "clients" because we are persuaded that Law Firm was not hired by Diversified to provide legal services or advice. It was employed solely for the purpose of making

an investigation of facts and to make business recommendations with respect to the future conduct of Diversified in such areas as the results of the investigation might suggest. The work that Law Firm was employed to perform could have been performed just as readily by non-lawyers aided to the extent necessary by a firm of public accountants. Thus Diversified has failed to satisfy one of the requisites of a successful claim of attorney-client privilege.

*Diversified Indus., Inc.,* 572 F.2d at 603. Similarly, in *Mission National Insurance,* the United States District Court for the District of Minnesota rejected application of the attorney-client privilege to communications involving a law firm investigating an insurance claim, even though the application of the attorney-client privilege "[i]s not dependent upon the anticipation of litigation, but instead depends upon the nature of the relationship involved." *Mission Nat'l Ins. Co.,* 112 F.R.D. at 163. Rather, the court concluded, "[i]t is clear that the attorney must be acting in the role of legal counsel with respect to the information in issue before the privilege may attach. If the attorney is acting in some other role, as an ordinary businessman for example, the privilege may not be properly claimed." *Id.* (citing *Diversified Indus., Inc.,* 572 F.2d at 602). Thus, in *Mission National Insurance,* the court specifically rejected application of the attorney-client privilege to materials generated by or provided to a law firm engaged in the non-legal business of acting as a claims investigator or claims adjuster. *Id.*

Here, at least until June 13, 2000, Mr. Schwartz was acting in his capacity as a claims investigator or claims adjuster, not as an attorney for the London Insurers. Therefore, even in the absence of waiver, no attorney-client privilege attached to any of the materials generated in Mr. Schwartz's investigation of CFC's claim prior to June 13, 2000. In contrast, the London Insurers have established that David H. Paige and Gil Isidro, "outside" attorneys employed by the London Insurers, were hired as legal counsel and, in the absence of the waiver found above, communications to and from Mr. Paige or Mr. Isidro prior to June 13, 2000, would be subject to the attorney-client privilege. *See Squealer Feeds,* 530 N.W.2d at 684; *Shook,* 497 N.W.2d at 886; IOWA CODE § 622.10; *accord Diversified Indus., Inc.,* 572 F.2d at 603; *Mission Nat'l Ins. Co.,* 112 F.R.D. at 163.

Nevertheless, the court found above that a waiver of the attorney-client privilege did occur in this case, owing to failure to assert the privilege in a timely and effective manner,[2] and that waiver applies to materials generated by and communications to and from Mr. Paige, Mr. Isidro, and any other attorneys employed by the London Insurers identified in the London Insurers' "Privilege Logs."

### 5. Relevance

▮ The London Insurers contend, however, that materials they have designated as

---

2. Also, it is no less bizarre that the London Insurers have asserted attorney-client privilege as to correspondence exchanged between their representatives and representatives of CFC and documents filed in this lawsuit or discovery requests and responses exchanged in the course of this lawsuit than it was for the London Insurers to assert work product privilege as to such documents. Attorney-client privilege is also waived by "'voluntary disclosure of the content of a privileged communication.'" *See Exotica Botanicals, Inc. v. Terra Int'l, Inc.,* 612 N.W.2d 801 (Iowa 2000) (*en banc*) (discussing waiver of both work product and attorney-client privileges, and quoting *Miller v. Continental Ins. Co.,* 392 N.W.2d 500, 504–05 (Iowa 1986)). Consequently, attorney-client privilege has been waived (if it ever existed) as to materials including the June 11, 2000, letter from Mr. Reck, counsel for CFC,

to Mr. Schwartz; the July 19, 2000, Notice, Summons & Complaint; the July 31, 2000, correspondence from David H. Paige, an attorney for the London Insurers, to Mr. Reck, counsel for CFC; the undated "Notice of Availability of Magistrate Judge To Exercise Jurisdiction & Appeal Option"; the undated "Form Order Requiring Submission of Scheduling Order"; and any other items filed in this case or any discovery requests or responses exchanged between the parties. *See* CFC's Memorandum of Law Regarding Attorney Client Privilege and Work Product Protection, Exhibit 1 (Privilege Log: Plaintiff's Document Production, November 10, 2000); *see also* The London Insurers' Memorandum of Law in Opposition To Defendant's Motion to Compel, Exhibit Q (Privilege Log: Plaintiff's Document Production, November 30, 2000).

privileged that were generated after June 13, 2000, are simply irrelevant to CFC's bad faith claim—presumably even if the privilege has been waived—because the issues on CFC's bad faith claim are whether reasonable grounds to deny CFC's insurance claim existed on June 13, 2000, and what the London Insurers "knew" on that date. Although the court will return to the question of what evidence is relevant to the "knowledge" element of CFC's bad faith claim below, for purposes of the privilege issue, the court agrees that documents generated after June 13, 2000, as to which privilege has been asserted are not relevant, and consequently are not discoverable, even if the privileges have been waived. This is so, because CFC does not contend that the purportedly reasonable ground to deny CFC's insurance claim that has been advanced in this litigation—CFC's purported failure to disclose the October 1999 terminations in its February 9, 2000, application for inclusion of Security State Bank under CFC's employment practices insurance policy—is *not* the ground upon which the London Insurers in fact relied in denying CFC's insurance claim. CFC disputes instead whether the London Insurers' reliance on this ground is "reasonable" in various respects.

Therefore, CFC's motion to compel will be granted as to all documents generated *on or before June 13, 2000,* that the London Insurers have thus far withheld upon assertions of work product and attorney-client privilege.[3]

### C. Prior "Bad Faith" Claims

■■■ In contrast to the analysis of the privilege issues in this case, the analysis of that part of CFC's motion to compel seeking discovery of information regarding other "bad faith" claims against the London Insurers will be quite brief. CFC argues that, in *Vining v. Enterprise Financial Group, Inc.,* 148 F.3d 1206, 1214 (10th Cir.1998), the Tenth Circuit Court of Appeals, applying what CFC describes as "pattern-and-practice logic," held that prior bad faith claims are

relevant and discoverable in bad faith cases where the applicable state law, like Iowa's, requires the claimant to establish subjective bad faith. CFC also contends that its request for information regarding other bad faith claims is not burdensome, because the London Insurers should already have such records and the ineffectiveness of their filing system to retrieve such information or the number of such claims should not be raised as a shield to discovery. The London Insurers, on the other hand, contend that prior bad faith claims by other parties have nothing to do with proof of the elements of CFC's own first-party bad faith claim. The London Insurers also contend that identifying every bad faith claim made against them, reviewing the files of those cases, removing privileged information, determining whether confidentiality orders apply to the materials, and if so, obtaining waivers from other parties involved in those cases, is indeed unduly burdensome.

Decisions of the Iowa Supreme Court provide very little guidance on what evidence is relevant to proof of the "knew or should have known" element of first-party bad faith claims, as disposition of nearly all of the court's decisions in such cases have turned on the failure of the plaintiff to prove that there was no reasonable basis for denial of the plaintiff's insurance claim. *See, e.g., Seastrom,* 601 N.W.2d at 347 (insurance claim was "fairly debatable," in light of a conditional receipt purportedly given to the plaintiff, so that the insurer was entitled to directed verdict on the plaintiff's bad faith claim); *Sampson,* 582 N.W.2d at 151 (whether the accident in question caused the plaintiff's medical complaints was "fairly debatable"); *Morgan,* 534 N.W.2d at 97–98 (bad faith claim should not have been submitted to the jury, because the plaintiff's insurance claim was "fairly debatable"); *Reuter,* 469 N.W.2d at 254–55 (conclusion that claim was "fairly debatable" entitled the insurer to judgment on a first-party bad faith claim, because a

---

**3.** CFC acknowledges that it has no need to "discover" documents generated after June 13, 2000, and provided to or received from CFC or its representatives, including correspondence between representatives of the London Insurers and representatives of CFC, items filed in this case, or any discovery requests or responses exchanged between the parties—that is, no need to "discover" items as to which the court has concluded the London Insurers' assertions of privilege were bizarre in the first place.

flawed investigation alone, although relevant to the "knowledge" element, does not negate an objectively reasonable basis to deny the insurance claim); *Dirks v. Farm Bureau Mut. Ins. Co.,* 465 N.W.2d 857, 862 (Iowa 1991) (where there was a reasonable basis for denying the insurance claim, the court was not required to consider the "knowledge" element); *Dolan,* 431 N.W.2d at 794–95 (the plaintiff failed to show the absence of a reasonable basis to deny the claim); *Brown,* 550 N.W.2d at 175 (court of appeals decision holding that the first element of the claim was not satisfied where the plaintiff had failed to comply with a requirement for examination under oath, and thus, the insurer had a reasonable basis for denying the plaintiff's claim). One lone exception is *AMCO Mut. Ins. Co. v. Lamphere,* 541 N.W.2d 910 (Iowa Ct.App.1995), in which the Iowa Court of Appeals reached the "knowledge" requirement in the alternative to its conclusion that the plaintiff's lack of cooperation was sufficient basis for the insurer to deny the plaintiff's insurance claim. *See AMCO Mut. Ins. Co.,* 541 N.W.2d at 914. However, the decision in *AMCO* is also largely unhelpful here, because, as to the "subjective" element of the claim, the court noted in that case only that the plaintiff "was unable to identify any evidence that AMCO knew or should have known it lacked any support for its decision to deny coverage," without suggesting what evidence would have demonstrated such knowledge. *Id.*

As CFC argues, the decision of the Tenth Circuit Court of Appeals in *Vining v. Enterprise Financial Group, Inc.,* 148 F.3d 1206 (10th Cir.1998), does stand for the proposition that evidence suggesting that the insurer systematically rescinded insurance policies without investigating whether or not it had good cause to do so was relevant to the "knowledge" element. *See Vining,* 148 F.3d at 1214. In *Vining,* that decision was coupled with the conclusion that the insurer could not rely on a reasonable basis for denying an insurance claim, if the insurer did not in fact rely on that reasonable basis at the time it denied the insurance claim. *Id.* at 1213–14 (the plaintiff did not dispute that her husband had a heart condition and that he signed a disclaimer indicating that he was in good health and had not been treated within the preceding 12 months for heart disease; she contended instead that the insurer did not actually rely upon that ground for denying the claim, but upon a systematic scheme to rescind life insurance policies when claims were made without investigating whether there was good cause to do so). Whatever the merits of the conclusion in *Vining,* the decision is inapposite here. As noted above, CFC has never contended that the London Insurers did not rely on the reason now asserted in litigation when they denied CFC's insurance claim. In its letter of June 13, 2000, the London Insurers attempted to rescind CFC's employment practices insurance policy on the ground that CFC failed to make necessary disclosures concerning the termination of certain employees from State Security Bank when CFC attempted to add coverage for State Security Bank, and the London Insurers assert the same grounds in this action as establishing their "reasonable basis" for denial of coverage. CFC contests the "reasonableness" of this basis for the London Insurers' denial of coverage, on the ground that CFC had provided all of the information specifically requested by the London Insurers and asked the London Insurers if they required any further information. In these circumstances, permitting CFC to discover information about other bad faith claims against the London Insurers would be to authorize a "fishing expedition" with little or no relevance to the merits of the bad faith claim as framed by the party asserting it. The proper question as to the "knowledge" element of CFC's bad faith claim in this case is whether the London Insurers knew or had reason to know that their denial on the basis of non-disclosure of material information was without a reasonable basis, that is, whether it was unreasonable to believe that a failure to disclose had occurred or unreasonable to believe that a material non-disclosure was a ground for denying coverage. *See Seastrom,* 601 N.W.2d at 346; *Sampson,* 582 N.W.2d at 149–50; *Morgan,* 534 N.W.2d at 96.

Assuming, *arguendo,* that evidence of other bad faith claims is somehow marginally relevant to CFC's bad faith claim, the court

agrees with the London Insurers that discovery of information regarding such claims would be unduly burdensome in relation to the likely benefits. *See* FED. R. CIV. P. 26(b)(2). Contrary to CFC's contentions, the London Insurers do not simply assert that a poor record-keeping system makes responding to the discovery request concerning other bad faith claims difficult. Rather, the London Insurers have identified substantial difficulties, even in the face of adequate record-keeping, that stand as impediments to discovery, such as the necessity for the London Insurers to redact the materials in question to protect privileges and confidentiality rights that belong to others, and/or the necessity of obtaining confidentiality waivers, which is a matter not entirely within the London Insurers' control.

Therefore, CFC's motion to compel response to discovery requests for information concerning other bad faith claims will be denied.

### D. Sanctions

As this court explained in its prior ruling imposing discovery sanctions, Rule 26(g) of the Federal Rules of Civil Procedure provides, in pertinent part, as follows:

> (3) If without substantial justification a certification is made in violation of the rule, the court, upon motion or upon its own initiative, shall impose on the person who made the certification, the party upon whose behalf the request ... is made, or both, an appropriate sanction, which may include an order to pay the amount of the reasonable expenses incurred because of the violation, including a reasonable attorney's fee.

FED. R. CIV. P. 26(g); *Perkins v. General Motors Corp.,* 965 F.2d 597, 600 (8th Cir.), *cert. denied,* 506 U.S. 1020, 113 S.Ct. 654, 121 L.Ed.2d 581 (1992). This Rule allows the court to impose sanctions on the signer of a discovery response when the signing of the response is incomplete, evasive or objectively unreasonable under the circumstances. *Poole v. Textron, Inc.* 192 F.R.D. 494, 498 (D.Md.2000); *see also Chudasama v. Mazda Motor Corp.,* 123 F.3d 1353, 1372 (11th Cir. 1997) (stating that the signature certifies that

the filing conforms to the discovery rules, is made for proper purpose, and does not impose undue burdens on the opposing party in light of the circumstances of the case); *Malautea v. Suzuki Motor Co.,* 987 F.2d 1536, 1545 (11th Cir.1993), *aff'g Malautea v. Suzuki Motor Corp.,* 148 F.R.D. 362, 374 (S.D.Ga.1991) (upholding Rule 26(g) sanctions for a "pattern of conduct" manifesting improper purpose that consisted of meritless objections to requests as irrelevant or overly burdensome, and partial answers to discovery questions that were evasive and misleading); *accord Project 74 Allentown, Inc. v. Frost,* 143 F.R.D. 77, 84 (E.D.Pa.1992). It is the responses themselves that are the proper object of Rule 26(g) sanctions. *See, e.g., Legault v. Zambarano,* 105 F.3d 24, 28 (1st Cir.1997) (imposing monetary sanction on client and counsel under Rule 26(g) for failure to produce documents responsive to legitimate discovery requests); *Gonsalves v. City of New Bedford,* 168 F.R.D. 102, 114–15 (D.Mass.1996) (imposing $15,000 sanction on counsel for causing client to respond falsely to interrogatories).

In this case, the court finds that the London Insurers' continued assertion of privileges, after once being warned of the impropriety of their assertions, was "without substantial justification." *See* FED. R. CIV. P. 26(g). The court will therefore impose upon the London Insurers sanctions in the form of payment of CFC's reasonable attorneys' fees and expenses incurred in bringing and arguing CFC's motion to compel. *See id.* CFC shall submit adequate proof of such attorneys' fees and expenses and the court shall determine, upon CFC's submission and response by the London Insurers, the appropriate amount to be awarded as sanctions.

### III. CONCLUSION

Upon full consideration of the parties' submissions concerning the two remaining, highly contentious, discovery disputes, CFC's motion to compel discovery responses and for an award of sanctions is **granted**, to the extent that the London Insurers shall produce all documents generated *on or before June 13, 2000,* that the London Insurers have thus far withheld upon assertions of work product

and attorney-client privilege. CFC's motion to compel is **denied** to the extent that the London Insurers shall not be required to provide responses to discovery requests for information concerning other bad faith claims. Further, pursuant to Federal Rule of Civil Procedure 26(g), as a sanction for continued assertions of privileges without substantial justification, the London Insurers shall pay CFC's reasonable attorneys' fees and expenses incurred in bringing and arguing CFC's motion to compel. CFC shall submit adequate proof of such attorneys' fees and expenses and the court shall determine, upon CFC's submission and response by the London Insurers, the appropriate amount to be awarded as sanctions.

**IT IS SO ORDERED.**